BOND et al. v. PHELPS, State Budget Director, et al.

No. 33240. March 30, 1948.

*191 P. 2d 938.*

Cobb, Hill & Godfrey, Houston Bus Hill, John Barry, Richardson, Shartel, Cochran & Pruet, and Earl Pruet, all of Oklahoma City, for plaintiffs.

Mac Q. Williamson Atty. Gen., and Fred Hansen First Asst. Atty. Gen., for defendants.

Donald Campbell and Geo. W. Cunningham, both of Tulsa, Vernon Roberts, of Ada, W. T. Anglin, of Holdenville, and Forrest M. Darrough, of Tulsa, amici curiae.

STAMPER, Special Justice. This is an original action in this court wherein plaintiffs, who are members of the Corporation Commission of Oklahoma, seek an order in the nature of mandamus directing the defendants, the State Budget Director, the State Auditor, and the State Treasurer, to allow and pay the claims of plaintiffs for services performed by them during the month of July, 1947, in compliance with sections 1 to 3, inclusive of Enrolled House Bill No. 172 of the 1947 Legislature (52 Okla. St. Ann. §§451-453). The act purported to make, as an elective duty of the members of the Corporation Commission, the preparation of an annotated compilation of all the oil and gas laws

of Oklahoma and the general orders, rules and regulations adopted pursuant thereto by the Corporation Commission of Oklahoma, and provided that such additional elective duties of the commissioners should be performed so as not to interfere with the regular official duties of such commissioners. The commissioners have each elected to perform these additional duties and filed their claims with defendants for extra compensation at the rate of $2,500 per annum as provided by the Legislature.

Defendants refused or failed to allow plaintiffs' claims and plaintiffs commenced this action.

The Attorney General urges for the defendants that the act is void insofar as it applies to the commissioners now in office, by reason of section 10, art. 23 of the Constitution, which provides as follows:

"Except wherein otherwise provided in this Constitution, in no case, shall the salary or emoluments of any public official be changed after his election or appointment, or during his term of office, unless by operation of law enacted prior to such election or appointment. . . ."

The legislative acts in question are:

"Section 1. Inasmuch as the laws of the State of Oklahoma relating to oil and gas and the rules and regulations promulgated by the Corporation Commission pursuant thereto, have never been compiled and annotated, it shall Corporation Commission of Oklahoma to prepare, in such manner as they deem proper, an annotated compilation of all the oil and gas laws of Oklahoma and the general orders, rules and regulations adopted pursuant thereto by the Corporation Commission of Oklahoma; said compilation and annotations to be supplemented by proper supplementary notes. Same shall be filed in the State Library as a public record, and as such shall be subject to inspection by the public. Said annotated compilation shall be published and shall be distributed free to the persons interested therein, and shall be from time to time supplemented so as to include any

changes occasioned either by legislative enactment, judicial interpretation, or orders issued by the Corporation Commission; provided further that before said Commissioners shall be authorized or required to perform the service defined by this Act, same to be performed so as not to interfere with their regular official duties, they shall each file a certificate in the office of the Secretary of State setting forth their willingness to perform said service.

"Section 2. Each of said members of the Corporation Commission shall receive as compensation for the service required by this Act the sum of Twenty-Five Hundred Dollars ($2500.00) annually, payable monthly; such sums to be paid from the Conservation Fund, until such time as said compilation and annotations have been completed or until such time as an act of the Legislature of this State providing for an equivalent increase in pay out of the general revenue funds shall be effective as to each member of the Corporation Commission, whichever time is shorter.

"Section 3. The cost of publishing the annotated compilation provided for herein shall be paid from the Conservation Fund."

A similar question was before this court in the case of Phelps et al. v. Childers, State Auditor, et al., 184 Okla. 421, 89 P. 2d 782. In the Phelps case, the court had under consideration a statute very similar to the one here involved, providing that the Justices of the Supreme Court, elected at the general election in 1934, should compile certain procedural statutes and annotate the same, fixing the compensation for such service at $2,500 annually, payable monthly, requiring the work as and when completed to be filed in the State Library. The court there held that such new duties or services were foreign to or beyond the scope or range of and not germane to the duties of the office of Justice of the Supreme Court and the additional compensation provided therefore did not violate section 10, art. 23 of the Constitution. The court's opinion recited and defined the nongermane rule as follows:

"When a statute imposes duties or calls for the performance of service that is nongermane and beyond the scope of the duties of the office as the same existed prior to the enactment of the statute, the one holding such office may not be required to perform the nongermane duty or service and cannot be disturbed in the enjoyment of his office for his refusal to do so. Any other rule would permit the Legislature to drive an executive or judicial officer from office by passing a statute placing upon such officer nongermane duties or requiring nongermane service, and thereby permit the invasion of the very field section 10, art. 23 protects. The cases all hold that where the duties are nongermane and the officer accepts and agrees to perform the nongermane duty or service, the Act does not violate such a constitutional provision. See the Annotation to the A.L.R. Citations, supra. . . . "

The nongermane rule is not the product of this court, but has been announced and followed by many courts in states having constitutional provisions similar to our own.

One of the most carefully considered opinions on the subject is that of Groesbeck, Governor, v. Fuller, Auditor General, 216 Mich. 243, 184 N. W. 870, by the Supreme Court of Michigan. In this case there was involved an act of the Legislature whereby a state administrative board was created. On this board were the Governor, Secretary of State, State Treasurer, Auditor General, Attorney General, State Highway Commissioner, and State Superintendent of Public Instruction. Their duties were to exercise general supervisory control over the functions and activities of all administrative departments, boards, commissioners, officers of the state, and state institutions. In addition, they were to perform all of the duties theretofore vested in the State Budget Commission, the State Purchasing Agent, and also were given control of the system of state accounting. For these duties they were each to receive compensation at the rate of $2,500 per year in addition to their

salaries as heads of their respective departments. The Michigan Supreme Court, in holding that the Constitution did not prohibit the payments of such compensation, said:

"The authority of the Legislature to prescribe duties is and must be subject to limitation. The official cannot be required to perform all manner of public service at the will of the Legislature. . . .

"As has been said, the duty imposed must belong to the office; it must fall within the ordinary range or scope of the work of such office. The duties provided for in the act clearly do not do so. If the state treasurer as such may be required to act as a member of a board exercising supervision over the state highway department, may he not be required by law to perform all of the duties of state highway commissioner, or the auditor general be required to act as a commissioner of agriculture? The duty prescribed must be an official one, else the incumbent cannot be compelled to perform it, and if rendered by him it may be compensated for without a violation of the provisions of section 21 of article 6 of the Constitution."

In Moore v. Moore, Auditor, 147 Va. 460, 137 S. E. 488, this question arose. The General Assembly of Virginia enacted a law which relieved county officials of the duty of assessing and collecting inheritance taxes and placed this duty on the State Auditor. It further provided that the State Auditor should receive $1,000 annually as compensation for such extra services. It was urged that the act was in violation of the Constitution insofar as the incumbent in office was concerned. The Virginia court held, however, that the Constitution never contemplated that an official may not be compensated for the performance of duties foreign to his office. After citing various cases on this point, the court in its opinion said:

"Applying the principle and reasoning of these precedents to the facts which we have here, we conclude that the general assembly did not violate the constitutional inhibition in providing for the additional compensation for the auditor. The statute was a measure of economy; it transferred to and imposed upon the auditor duties theretofore imposed upon certain local officials, whose aggregate fees far exceeded the additional compensation so provided for the auditor. Certainly it cannot be fairly said, it seems to us, that the duties specifically imposed upon local commissioners, clerks, treasurers, and courts throughout the commonwealth, prior to the Act of 1924, under consideration, could at the same time be held to be within the scope of the duties of the auditor of public accounts. The very fact that these duties were imposed upon other officials is most persuasive in support of the view that they were not germane to the duties of the auditor. The statute transferred the duties of numerous local officials to the auditor, thus relieving the state from their fees, and it seems to us to be trifling with language to say these were not additional duties for which the general assembly could and should provide reasonable compensation.

"Our conclusion, then, is that the general assembly did not exceed its power in making the provision for the auditor of $1,000 per annum, and that he is entitled thereto. We feel that it would approach a misuse of our power to undertake to nullify the legislative judgment, so soundly based, which has already been pronounced by the general assembly on the question involved."

The case of State ex rel. Harvey v. Sheehan, City Auditor, 269 Mo. 421, 190 S. W. 864, involved the same question. The Legislature of Missouri had passed an act in which it was directed that circuit attorneys in cities of more than 500,000 should attend inquests held by coroners in cases of death caused by violence which might result in charges of felony. The act further provided that said circuit attorneys should receive $10 for each inquest so attended. Harvey was circuit attorney of St. Louis—a city of more than 500,000 inhabitants. He brought this action to require the city auditor to audit his claim for $440 covering 44 inquests so that the claim could be paid. The auditor contended that this was a raising

of the salaries and fees of the attorney in violation of the Constitution, because Harvey was holding office when the act was passed. The Supreme Court of Missouri held that the statute was not in violation of the Constitution and required the auditor to audit the claim. The portion of the opinion which holds that the duty of attending the inquest was compensable is as follows:

"Another contention made is that, since the appellant was an officer at the time of the passage of the act, it is inapplicable to him, because the Constitution prohibits any increase in the pay of an officer during his term of office. We think this contention unsound, because the act in question enjoins upon such officers as appellant new and additional duties and provides merely a compensation therefor. While in some jurisdictions a constitutional provision such as ours has been held to inhibit even this, in this and many other states the contrary doctrine has been accepted and acted upon. Cunningham v. Current River Co., 165 Mo. 270, 65 S. W. 556; State ex rel. v. Walker, 97 Mo. 162, 10 S. W. 473; State ex rel. v. Ramson, 73 Mo. 89; State ex rel. v. McGovney, 92 Mo. 428, 3 S. W. 867; County v. Felts, 104 Cal. 60, 37 P. 780; State ex rel. v. Board of Commissioners, 23 Mont. 250, 58 P. 439; State ex rel., v. Carson, 6 Wash, 250, 33 P. 428; Love, Attorney General, v. Baehr, Treas., 47 Cal. 364; Purnell v. Mann, 105 Ky. 87, 48 S. W. 407, 49 S. W. 346, 50 S. W. 264; Lewis v. State, 21 Ohio Circuit Ct. R. 410.

"It is our opinion that the act is valid, and that the appellant is entitled to the fees demanded, and that the respondent was not justified in refusing to audit the account and draw a warrant therefor on the city treasurer."

In Jackson, Clerk, v. Sherrod, Deputy Solicitor, 207 Ala. 245, 92 So. 481, the Supreme Court of Alabama had under consideration an act of the Legislature, the effect of which was to enlarge the criminal jurisdiction of the county court of Lawrence county and to impose upon the deputy solicitor the duty of prosecuting all criminal cases coming before the county court pursuant to such enlarged jurisdiction. It provided for compensation to be paid out of fees collected and paid to him in the manner provided by statutes of the state. It was urged that the act in question, insofar as it provided additional compensation to the deputy solicitor, violated the section of the Constitution which provided against increasing or decreasing fees of public officers. In sustaining the constitutionality of said act, the Alabama Supreme Court, in its opinion, said:

"That law is not disturbed in the least by the present act. As we have already pointed out, the criminal jurisdiction of the county court is enlarged, in truth a new court is established. Also new duties are imposed upon the deputy solicitor; he is required to give his services in causes which previously had been triable in the circuit court. It was competent for the Legislature to award to him compensation for these new services of a substantial sort, and to prescribe that his compensation should be confined within a fixed limit or should include all fees earned by him."

James, Auditor, v. Cammack, 139 Ky. 223, 129 S. W. 582, involved an act of the Kentucky Legislature providing that circuit judges should be appointed and commissioned as special judges and could be sent into any part of the state to hold court outside of their own circuits. Extra compensation for their services in this connection was provided for. It was contended that the legislative act in question was patently a mere evasion of the Constitution; that the Legislature's motives and intent were subversive of the judiciary's independence; that the effect of the act did not augur well for the future commonwealth. The act was upheld and the compensation was allowed the judges who were in office at the session of the Legislature in which the act was passed. In holding extra work of the circuit judges to be constitutional and compensable, the court in this case said:

"So that, clearly, it is not a part of the jurisdiction of any circuit court of this commonwealth that the judge shall

discharge the duties of special judge in any other district; and although it may be within the competency of the Legislature to impose the duties of holding special court upon the regular judges, these duties are not a part of the regular jurisdiction of their courts, but entirely outside of that jurisdiction. They are duties which the Legislature can either impose upon the regular circuit judges of the state or not, as it sees proper. They are duties which the Legislature can with equal propriety impose, or authorize to be imposed, upon any other members of the bar of the state qualified to hold circuit court. A special judge need not be a regular circuit judge; he may be any person authorized by law to preside as special judge.

"Now, then, if it be true that the duties of a special judge are not a part of the jurisdiction of a circuit court, or a part of the duties of a regular judge, then it seems to us, both upon reason and authority, that if the Legislature sees proper to impose upon the regular circuit judges these extra judicial duties, it may at the same time provide what in its opinion is a reasonable remuneration to these officers for discharging these extra duties; and the act which does so does not fall within the inhibition of section 235 of the Constitution. . . .

"The duties of a special judge are performed outside of the regular judge's district, and they have no legal connection with his regular duties. The duties of a special judge by the act in question are imposed upon the judge as an individual, and are not a part of the duties of his office. To remunerate him for these duties is not an increase of the salary of his office, within the meaning of the constitutional inhibition. The Legislature may add them or not, as it pleases, and afterwards, if it sees proper, may repeal the act and deprive the judges of the opportunity to perform the extra labor and receive the extra salary without in any wise changing their compensation within the meaning of section 235. So far as the performance of the duties of special judges are concerned, the regular judges stand as any other qualified individuals. They may be appointed by the legislative power or not, as

the general assembly deems proper. With the wisdom or unwisdom of this act this court has nothing to do. If it is within the competency of the Legislature, it is for it to decide upon the scheme which will best subserve the public interest in supplying special judges when necessity requires. The regular judge cannot demand that these duties shall be imposed upon him, if the Legislature sees proper to provide other means of performing the duties of special judge."

Coleman, State Auditor, v. Hurst, 226 Ky. 501, 11 S. W. 2d 133, concerned an act of the 1928 Kentucky General Assembly establishing a "Judicial Council" composed of judges of the Court of Appeals and the circuit judges of the state. The general duties of the council were to study the organization, rules, methods of procedure and practice of the judicial system of the state; also, to study the work accomplished and the results produced by the judicial system in its various parts and the problems of administration confronting the court and the judicial system in general. The act also provided that the circuit judges should each receive $600 annually for these services, which would be in addition to their regular salaries. It was urged that this act was in violation of section 235 of the Kentucky Constitution forbidding changes in salaries of such state officers during the term for which they were elected. In upholding the constitutionality of the act, the Kentucky court cited with approval the case of James, Auditor, v. Cammack, supra, and other Kentucky cases on the subject; then holding that the duties imposed on the circuit judges were not germane to their office, the court said:

"If we should hold that the act creating the judicial council is unconstitutional we would have to overrule many cases, and the court would be compelled to depart from the principles announced in opinions from time to time for more than a quarter of a century. This we cannot do. The duties of members of the Judicial Council are not duties added to the office of circuit judge, for which no compensation may be allowed

during the term, but the duties are wholly outside of the duties which a circuit judge is required to perform, and, therefore, under the many cases cited, the compensation is legal, and the act does not violate any of the provisions of the Constitution relating to compensation to be paid out of the state treasury. . . .

"There is some suggestion that the act is not a wise exercise of legislative power. Courts cannot go into the question, but it is not out of place to say that the general purposes of the act are to make justice more speedy and less expensive. The duties imposed upon the members of the council are such that their performance will amply entitle those who perform them to the compensation allowed."

Numerous cases have been cited in briefs and oral argument and the court has examined them with care. The constitutional provisions of the various states whose courts have followed the nongermane theory, have been carefully compared with the provisions of our own Constitution.

Section 21 of article 6 of the Michigan Constitution provides as follows:

"The Governor and Attorney-General shall each receive an annual salary of five thousand dollars. The Secretary of State, State Treasurer, Commissioner of the State Land Office and Auditor-General shall each receive an annual salary of twenty-five hundred dollars. They shall receive no fees or perquisites whatever for the performance of any duties connected with the offices. It shall not be competent for the Legislature to increase the salaries herein provided."

Section 235 of the Constitution of Kentucky provides as follows:

"The salaries of public officers shall not be changed during their terms for which they were elected."

Article 5, sec. 83 of the Constitution of Virginia provides as follows:

"The salary of each officer of the executive department shall be fixed by law, and shall not be increased or diminished during his term of office."

Constitutional provisions of the other states which have followed the rule discussed do not vary substantially from those cited. It has been suggested that the words "in no case, shall the salary or emoluments . . . be changed" differ from "it shall not be competent for the Legislature to increase," or "shall not be changed," or "the salary shall not be increased or diminished."

This court cannot detect substantial difference in these statements. They merely express the same inhibitions in different manners. The words "thou shalt not" are not changed by phrasing them "in no case shalt thou".

We believe the nongermane theory as expressed by various courts and by this court in the Phelps case, supra, to be so well established that it is settled law. We hesitate to substitute our own opinions of the wisdom of this legislation for the well expressed and defined opinions of most of the Judges who have deliberated and opined thereupon. Our system of law is built upon precedents, and if every past decision can be reopened in every case and one cannot lay one's own course of bricks on the secure foundation of the courses laid by others who had gone on before him, the labor of lawyers and judges would be increased almost to the breaking point. Judges should be reluctant to travel outside the boundaries set to judicial action by precedent and custom. In this instance we feel impelled to follow precedent and therefore we refuse to decide that the theory of germane and nongermane duties as expressed above is not the law in Oklahoma.

Especially is this so, when we consider well known rules of constitutional interpretation, as expressed in 1 Cooley's Constitutional Limitations (8th Ed.) p. 371, viz.,

"When courts are called upon to pronounce the invalidity of an act of legislation, passed with all the forms

and ceremonies requisite to give it the force of law they will approach the question with great caution, examine it in every possible aspect, and ponder upon it as long as deliberation and patient attention can throw any new light upon the subject, and never declare a statute void, unless the nullity and invalidity of the act are placed, in their judgment, beyond reasonable doubt."

We cannot say that the nullity and invalidity of the legislative act here involved are beyond reasonable doubt. We approve the statement from the Phelps case, supra, hereinbefore cited and decline to reverse the previous pronouncement of this court.

It now becomes necessary to consider whether Enrolled House Bill 172 is within the rule which we have chosen not to reverse. A portion of article 9 of our Constitution deals with the Corporation Commission. Section 15 creates, prescribes the term of office, and directs the manner of filling vacancies. Section 16 sets up the qualifications of commissioners. It prohibits commissioners from being interested in various utilities and provides as follows:

" . . . nor shall any such commissioners hold any other office under the government of the United States or of this state or any other state government and shall not, while such commissioner, engage in any occupation or business inconsistent with his duties as such commissioner."

Section 18 prescribes the powers and duties of members of the commission. An examination of this section fails to disclose as a duty of the commission the compiling and annotating duties prescribed by House Bill 172. Sections 19 to 34 elaborate upon the powers and duties of the commission and prescribe procedure before the commission and methods of securing judicial review of its acts. Sections 35 prescribes that the Legislature may after the second Monday in January, 1909, alter, amend, revise or repeal sections 18 to 34.

We believe it clear that the word inconsistent, as used in section 16, article 9, is intended to prevent the commissioners from engaging in any occupation or business which might prevent the commissioners from being perfectly impartial and fair as such. It has been suggested that this section prohibits commissioners from accepting any other employment, but we cannot agree. It would be inconsistent with his duties as commissioner for a commissioner to hold stock in or be employed by a litigant before the Commission. It would not be inconsistent for him to run a poultry farm, leastwise, until the production of eggs is declared to be charged with public interest and thus require regulation. Addison said:

"Wisdom and virtue are far from being inconsistent with politeness and good humor."

If we may paraphrase, we will say that the wisdom and virtue of Oklahoma's oil and gas laws and the rulings thereunder by the State Corporation Commission are far from being inconsistent with the politeness and good humor exhibited by the Legislature and the Corporation Commission in furnishing to the Bar and the public a compilation and annotation of these same laws and rulings. However, the duties imposed by House Bill 172 are new duties. They are not regulatory. They are such as might have been, without criticism, contracted by the state to publishers or savants. Had such contract been made, the powers and duties of the Corporation Commission, individually or collectively, would not have been lessened one whit. Nor does this law impose any additional power upon the commission. Rather, it offers employment, to the individual commissioners, to be performed so as not to interfere with their regular constitutional and statutory duties. We believe these duties to be nongermane to the previous powers and duties of the members of the State Corporation Commission.

The Attorney General next urges that if the duties imposed upon the commissioners by House Bill No. 172 are

nongermane to the previously defined official duties of the commissioners, the act then embraces two subjects and violates section 57 of article 5 of the Constitution, viz.:

"Every act of a Legislature shall embrace but one subject, which shall be clearly expressed in its title, . . ."

Although ingenious, the argument is without merit. The question as to the germane or nongermane nature of the duties imposed upon members of the Corporation Commission by the act in question has no relationship whatever to the question as to whether the act covers more than one subject. In the first instance the question is:

"Are the new duties created by the act outside the scope of and nongermane to the official duties of the Corporation Commission as they existed under prior acts?

In the second instance the question is this:

Are the sections of the act which impose upon members of the Corporation Commission the duty of compiling and annotating the oil and gas laws of Oklahoma completely unrelated to the other parts of the act?

Obviously, the two questions are completely independent and have no relation to the other.

The act either embraces one subject or it does not, regardless of the nature of the duties thereby imposed upon the members of the Corporation Commission and regardless of whether such duties are germane or nongermane. The subject of the act is the same in either case.

In considering the question as to whether the act covers one or more subjects, it is well to review the act for the purpose of seeing just what it does cover. The first three sections impose certain duties upon the members of the Corporation Commission and provide for their compensation. The fourth section specifies the duties of the Director of Conservation and fixes his com-

pensation. Section 5 enumerates the duties of the conservation attorney and makes provision for payment of his salary. Sections 6 to 9, inclusive, provide for certain other officers and employees and specify their respective duties and pay.

The entire act then has to do with the duties to be performed by members of the Corporation Commission, its officers and employees, and the pay which they are to receive for services to be so rendered. Whether or not the duties imposed upon the members of the Corporation Commission are germane or nongermane, it cannot be urged successfully that the various sections of the act are unrelated.

The rule for interpreting constitutional provisions of the nature here under consideration is stated quite clearly in 50 Am. Juris., beginning at page 175, as follows:

"194. General Rules for Interpretation of Constitutional Provision. The constitutional provision prohibiting a statute from containing more than one subject or object should not be technically, strictly, or narrowly, but reasonably, fairly, broadly, and liberally construed, with due regard to its purpose. It should not be so construed so as to hamper or cripple legislation, or render it oppressive or impracticable, by a strictness unnecessary to the accomplishment of the beneficial purpose for which it was adopted, or to make laws unnecessarily restrictive in their scope and operation, or to multiply the number of laws unnecessarily, or to promote controversy in regard to the validity of legislative enactments.

"195. Rules Favoring Constitutionality of Statute. The rule that every legislative act is presumed to be constitutional and every intendment must be indulged by the courts in favor of its validity, is applicable to statutes claimed to be unconstitutional as in violation of the provision prohibiting statutes from containing more than one subject or object. The courts will accord the statutes a liberal construction with the view of sustaining the legislative action. Indeed, the objection should be grave, and the conflict between the statute

and the Constitution substantial and plain or palpable, before the judiciary should disregard a legislative enactment upon the ground that it embraces more than one subject or object. Under these rules, where a court is still in doubt as to the constitutionality of the act, it should sustain the same. The principles herein set forth do not, however, prevent the court from strictly enforcing the constitutional provision under consideration in cases that fall within the reasons on which the provision rests."

On page 178 of the same volume of American Jurisprudence, the following language is used:

"197. Matters Germane to General Subject or Object. The constitutional prohibition of more than one subject in an act does not impose any limitation on the comprehensiveness of the subject, which may be as comprehensive as the Legislature chooses to make it, provided it constitutes, in the constitutional sense, a single subject and not several. To constitute plurality of subject, an act must embrace two or more dissimilar and discordant subjects, that by no fair intendment can be considered as having any legitimate connection with or relation to each other. Within the meaning of the constitutional provision, matters which apparently constitute distinct and separate subjects are not so where they are not incongruous and diverse to each other. Generally speaking, the courts are agreed that a statute may include every matter germane, referable, auxiliary, incidental, or subsidiary to, and not inconsistent with, or foreign to, the general subject or object of the act. . . ."

The following cases are in point and indicate how far our own courts and other courts have gone in applying the rule announced in American Jurisprudence.

Rea, County Clerk, v. State ex rel. Board of Commissioners of Lincoln County et al., 29 Okla. 708, 119 P. 235. The Second Oklahoma Legislature passed an act declaring section lines public highways and prescribing the method for opening the same for public use; making township boards board of highway commissioners; providing for the appointment of road supervisors; providing for road duty, and for levying tax for road and bridge purposes; providing for working county and state convicts on public highways; providing for voluntary formation of road districts, for the construction of improved highways; authorizing counties and townships to issue bonds for road and bridge purposes; providing for appointment of a county engineer and prescribing his duties and powers. It was urged that said act was repugnant to section 57, art. 5, of the Constitution in that the title contained more than one subject. In sustaining the act in this regard, the Oklahoma Supreme Court said:

"The title of the act here under consideration, relating primarily only to one subject, namely, to public highways, the opening and improving of the same, and providing the agencies and means by which this may be done, does not appear to be repugnant to section 57, art. 5, of the Constitution. State ex rel. v. Hooker, County Judge, 22 Okla. 712, 98 P. 964; Lindsay v. United States Saving & Loan Association et al., 120 Ala. 172, 24 So. 171, 42 L.R.A. 783; State v. Street et al., 117 Ala. 206, 23 So. 807."

In re Lee, 64 Okla. 310, 168 P. 53: Section 5, chapter 87, Session Laws 1915, provided for a docket fee of $25 in each cause filed in the Supreme Court to be collected and recovered as other costs and provided for an advance payment to the clerk of $40. It contained other provisions relative to the creation of a temporary commission to assist the Supreme Court in disposing of causes accumulated and being filed in that court. It was urged that said act was invalid for the reason that it embraced two subjects, one having to do with the payment of fees in connection with filing cases in the Supreme Court and the other providing for appointment of a temporary commission to assist in disposing of cases filed in that court. In holding that the act did not violate the Constitution in this regard, the Supreme Court, in the body of its opinion, said:

"It is next insisted that the act (chapter 87, Session laws 1915, p. 113) embraces two subjects, and is therefore invalid under article 5, sec. 57, of the Constitution (Williams, sec. 147). We do not think the provision relative to fees and costs in causes filed in the Supreme Court and the provisions relative to the creation of a temporary commission to assist the court in disposing of the causes accumulated and being filed in said court are so distinct, unconnected, or incongruous as to relate to more than one subject within the meaning of the Constitution. Insurance Co., etc., v. Welch (49 Okla. 620) 154 P. 48; Noble State Bank v. Haskell, 22 Okla. 48, 97 P. 590; State ex rel. Caldwell v. Hooker, 22 Okla. 712, 98 P. 964; City of Pond Creek v. Haskell, 21 Okla. 711, 97 P. 338; Exparte Ambler, 11 Okla. Cr. 449, 148 P. 1061."

Oklahoma Light & Power Co. v. Corporation Commission of Oklahoma et al., 96 Okla. 19, 220 P. 54: There was involved in this case a statute which in one section declared illegal certain acts, agreements, contracts or combinations in the form of a trust, and in a later section provided for the regulation of certain businesses, the existence of which constituted a virtual monopoly. In upholding the act, the court, in the body of its opinion, said:

"It was intended by this constitutional provision to forbid the Legislature from embracing in any one act two or more unconnected subjects. Anything in an act nor germane to the general purpose expressed in the title brings such a statute within this constitutional prohibition. But it must be borne in mind that this provision of the Constitution only requires that the title of an act should express the subject, not the object, of the act, and it is no valid objection to a statute that the title fails to plainly indicate the purpose to be accomplished by the act, but the subject must be clearly stated. 25 R. C. L. sec. 94, p. 848; City of Pond Creek et al. v. Haskell, Governor, et al., 21 Okla. 711, 769, 97 P. 338; Falconer v. Robinson, 46 Ala. 340; State ex rel. v. Rogers et al., 107 Ala. 444, 19 So. 909, 32 L. R. A. 520.

"The true rule appears to be that, 'It is a sufficient compliance with these provisions that a law has but one general subject or object, which is fairly expressed in its title.' (25 R. C. L., p. 848)."

C. C. Julian Oil & Royalties Co. v. Capshaw et al., Corporation Commissioners, 145 Okla. 237, 292 P. 841: In this case the court was construing an act of the Oklahoma Legislature which defined waste of oil in such a way as to prevent discrimination as between producers and provided for the enforcement of provisions therein contained. It was urged that the act was invalid for the reason that it embraced more than one subject. The court overruled such objection and in so doing used the following language:

"It is first contended that the act of the Legislature in question is invalid for the reason it is in conflict with section 57 of article 5 of the Constitution of Oklahoma, which provides that every act of the Legislature shall embrace but one subject, which shall be clearly expressed in its title. This act is not in conflict with said section, because the act does embrace but one subject, to wit, prevention of waste of oil, and said subject is clearly expressed in the title. This section was construed in Ex parte Ambler, 11 Okla. Cr. 449, 148 P. 1061; Oklahoma Light & Power Co. v. Corporation Commission, 96 Okla. 19, 220 P. 54; Griffin v. Thomas, 86 Okla. 70, 206 P. 604. Under the authorities above cited, it was held that if the act has but one general subject that is fairly indicated by the title, it may have many details, but if they all relate to the same general subject or object they are properly included therein. The purpose of this provision of the Constitution was to forbid the Legislature from embracing in any one act two or more unconnected subjects."

Smith et al. v. State, 47 Okla. Cr. 184, 287 P. 835: This case is one in the Criminal Court of Appeals. The case arose under a statute which prohibited the unlawful tapping of oil pipe lines and made unlawful the taking of oil or gas from pipe lines. It was urged by the defendant that the act

was invalid for the reason that it embraced more than one subject. The Criminal Court of Appeals overruled such objection in the following language:

"It is urged, by the defendants, that under the Constitution, the title of an act of the Legislature must contain but one subject, and the defendants insist that the statute under which they were prosecuted clearly contains two subjects: First, that tapping of pipe lines, and second, the larceny of crude oil and its manufactured and natural products; and the defendants further insist that the act is unconstitutional, for the reason that one of the objects of the act is to make a felony of certain acts, and the second subject or object is to make a misdemeanor of certain other unrelated acts. No authorities, other than Section 57, art 5, supra, are cited to sustain the position of the defendants that the act is unconstitutional for the reason that it embraces more than one subject in the title of the act. The intention of the Legislature, in the passing of this act, evidently, was for the protection of crude oil, gas, etc., in storage tanks or pipe lines. Section 1 of the act makes it a felony, or makes the connecting with tanks or pipe lines used to conduct, or store crude oil, with the intent to deprive the owner thereof, of such products, a felony. Section 2 makes it a crime to take crude oil, or gasoline, or products thereof from any pipe line, tank, or receptacle, or container with intent to deprive the owner thereof."

Ule v. State (Ind.) 194 N. E. 140; The Indiana Hit and Run Drivers' Act provided for registration and licensing of motor vehicles, for the regulation of the use and operation thereof on public highways, for the licensing of chauffeurs, for the transfer of ownership of motor vehicles, and for liens on motor vehicles for storage, supplies and repairs. Appellants contended that the act was unconstitutional for the reason that there were two distinct subjects covered, one for the regulation of motor vehicles and the other granting liens to persons in certain cases. The Indiana Supreme Court, in sustaining the constitutionality of the act in question, said:

"The several matters embraced relate to 'motor vehicles' and we believe, from the standpoint of legislative treatment, there was a reasonable basis for the grouping together of the various matters in the act. We do not believe there is a duplicity in the title and body of the act."

State ex rel. Taylor v. Mirabal (N. M.) 273 P. 928: The act of the New Mexico Legislature here in question contained one section which fixed registration fees for motor vehicles, and another which provided for the payment of property tax thereon. It was urged that the act was unconstitutional for the reason that it embraced more than one subject. The Supreme Court of New Mexico overruled such objection and in doing so used the following language:

"Having regard for the general principles concerning the constitutional requirement laid down in State v. Ingalls, 18 N. M. 211, 135 P. 1177, and State v. Miller (N. M.) 263 P. 510, we are of the opinion that the subject of the act in question is 'motor vehicles and trailers,' or it might be stated that the subject is 'motor vehicles and trailers operated on the highways of this state.' And we are of the opinion that none of the provisions of the act are so disconnected or repugnant to this subject or to each other that it can be said that by no fair intendment can they be considered as germane to this general subject. The fact that the act provides for the manner of the imposition of a property tax on such motor vehicles and trailers as are operated on the public highways, does not create a new, different, and separate subject in the act. The subject being a particular class of things, to wit, motor vehicles and trailers operated on the highways of this state, there is no apparent reason why the Legislature may not, in the exercise of its sovereign power, exercise its power of taxation of such things."

Under the rule announced in the foregoing cases, it seems clear that En-

rolled House Bill 172, which is here under consideration, embraces but one subject, that is, the Corporation Commission of Oklahoma, its members, officers and employees. Regardless of whether the duties thereby imposed upon the members of the Corporation Commission are germane or nongermane to their official duties, the subject remains the same. The purpose of the constitutional requirement that but a single subject be included in a legislative bill is to make impossible by log-rolling devices the enactment of unpopular legislation by including it with popular legislation on an entirely different subject. There is nothing in the legislative act here in question which indicates any such purpose. Embracing but one subject, it makes provision for the duties to be performed by the members of the Corporation Commission, its officers and employees, and specifies their remuneration. In so doing, it violates in no respect section 57, article 5, of the Oklahoma Constitution.

We are of the opinion that House Bill 172 is constitutional and that the present members of the Corporation Commission may receive compensation as it provides.

The writ will issue.

BASKIN, JOHNSON, BASSMAN, SWEET, and BABCOCK, Special Justices, concur. RILEY, Acting C.J., BRANSON, Acting V.C.J., and POWELL, Special Justice, dissent.

———

BRANSON, Acting V.C.J. (dissenting). This is an original action in this court. The plaintiffs, Reford Bond, Ray O. Weems and Ray C. Jones are the Corporation Commissioners of the State of Oklahoma. The plaintiffs allege that the plaintiff Bond was elected a member of said Commission at the general election held in November, 1942; that Ray O. Weems was elected a member of the Corporation Commission at the general election held in November, 1944

and that Ray C. Jones was elected a member of the Corporation Commission at the general election held in November, 1946; each having been elected for a term of six years and having taken the oath of office in January succeeding their respective elections.

Plaintiffs further allege that the defendant, Roger Phelps, is State Budget Director of the State of Oklahoma, and as Director is enjoined with the duty of receiving, auditing, allowing and settling claims for compensation of officers and employees of the State of Oklahoma; that the defendant, A. S. J. Shaw, is the duly elected, qualified, and acting State Auditor of the State of Oklahoma and as such State Auditor is enjoined with the duty of drawing warrants payable out of the State Treasury in payment of claims for compensation of officers and employees of the State of Oklahoma; and that the defendant, John Conner, is State Treasurer of the State of Oklahoma, and as such is enjoined with the duty of honoring and paying such warrants as are issued by the State Auditor.

Further allegations of the petition are: That the Twenty-First Legislature of the State of Oklahoma passed an act, the same being House Bill No. 172, which was approved by the Governor May 21, 1947, which act made it the duty of these plaintiffs to prepare an annotated compilation of the oil and gas laws of Oklahoma and the general orders, rules and regulations adopted pursuant thereto by the Corporation Commission and to file the same in the State Library as a public record, and the said act fixed the compensation of each of the plaintiffs for said services in the sum of $2,500 per annum.

Plaintiffs further allege that the said act provided that before plaintiffs should be required to perform the services referred to, each of them should file a certificate in the office of the Secretary of State setting forth his willingness to perform said services, and that on July 1, 1947, each of the

plaintiffs did file in the office of the Secretary of State the said certificate referred to, and that the plaintiffs began the performance of the said duties contemplated by the said act and have continued to perform the same.

The plaintiffs further plead that, on the 31st day of July, 1947, each of them filed with the defendant, Roger Phelps, their respective claims for services theretofore rendered in the sum of $208.34, but that the defendant, Roger Phelps, refused to audit and approve the claims of these plaintiffs. Plaintiffs further plead specifically sections 1 to 3, both inclusive of said act. Said sections provide:

"Section 1. Inasmuch as the laws of the State of Oklahoma relating to oil and gas and the rules and regulations promulgated by the Corporation Commission pursuant thereto, have never been compiled and annotated, it shall be the duty of the members of the Corporation Commission of Oklahoma to prepare, in such manner as they deem proper, an annotated compilation of all the oil and gas laws of Oklahoma and the general orders, rules and regulations adopted pursuant thereto by the Corporation Commission of Oklahoma; said compilation and annotations to be supplemented by proper supplementary notes. Same shall be filed in the State Library as a public record, and as such shall be subject to inspection by the public. Said annotated compilation shall be published and shall be distributed free to the persons interested therein, and shall be from time to time supplemented so as to include any changes occasioned either by legislative enactment, judicial interpretation, or orders issued by the Corporation Commission; provided further that before said Commissioners shall be authorized or required to perform the service defined by this Act, same to be performed so as not to interfere with their regular official duties, they shall each file a certificate in the office of the Secretary of State setting forth their willingness to perform said service.

"Section 2. Each of said members of the Corporation Commission shall receive as compensation for the service required by this Act the sum of Twenty - Five Hundred Dollars ($2500.00) annually, payable monthly; such sums to be paid from the Conservation Fund, until such time as said compilation and annotations have been completed or until such time as an act of the Legislature of this State providing for an equivalent increase in pay out of the general revenue funds shall be effective as to each member of the Corporation Commission, whichever time is shorter.

"Section 3. The cost of publishing the annotated compilation provided for herein shall be paid from the Conservation Fund."

The plaintiffs assert that the defendants refused to audit and pay their claims because the said act of the Legislature was void in that it contravened certain sections of the Constitution of the State of Oklahoma. The response of the defendants is, in effect, a demurrer.

We will discuss the constitutional provisions insofar as we deem the same applicable to the questions here raised under three separate headings.

The act as related to section 10, article 23 of the Constitution.

Section 10, article 23 of the Constitution of Oklahoma provides:

"Except wherein otherwise provided in this Constitution, in no case, shall the salary or emoluments of any public official be changed after his election or appointment, or during his term of office, unless by operation of law enacted prior to such election or appointment . . . "

Plaintiffs say in their brief and oral argument that the question is: whether or not the compensation therein provided could be paid to the plaintiffs during their present term of office to which each of the plaintiffs was elected and qualified.

Plaintiffs urge the nongermane doctrine, that if the duties imposed upon the plaintiffs by the said act are germane to their official duties that their

prayer for mandamus should be denied, but, on the other hand, plaintiffs urge that the duties imposed upon the members of the Corporation Commission by the said act of the Legislature are nongermane to the performance of their constitutional and statutory duties as such officers of the state, and said section 10, article 23 does not prohibit their receiving the $2,500 each, although the act of the Legislature was passed after plaintiffs became such officers, and during their present terms.

There are only two cases from this court since the adoption of the Constitution of this state touching the increase of salaries and emoluments of public officials by an act passed during the term of such public officials which were turned on this doctrine. Note that we say there are only two cases turned on this question since statehood.

The first of the two cases mentioned is entitled Board of County Commissioners of Creek County v. Bruce et al., 51 Okla. 541, 152 P. 125, decided October 15, 1915. The Legislature had passed an act to protect fish, game, birds, etc., and provided that the county clerk of the various counties of the state should issue hunting licenses and that said clerks should retain 25 cents out of the fee for each license as his compensation for issuing the same. The county clerk of Creek county was such officer at the time that the said act was passed. The opinion concludes that the county clerk could not retain the 25 cents for issuing each license and in reaching this conclusion the Supreme Court Commission discussed the said doctrine of germane and nongermane duties of public officials. The said opinion, after discussing the said doctrine of whether or not the duties imposed were germane or nongermane, held that the said duty of issuing hunting licenses was germane to the duties of the office of county clerk, and being such he could not receive additional emoluments other than that provided by law at the time he became such of-

ficial; and the commissioner's opinion then recites:

"There is another reason why he (meaning the county clerk—ours—) is not entitled to these fees and that is to permit him to retain them would increase the emoluments of his office in violation of section 10, article 23 of the Constitution."

Supporting this quoted statement, several previous cases from this court were cited, to wit: Board of County Commissioners of Greer County v. Henry et al., 33 Okla. 210, 126 P. 761; Jones et al., Grady County Commissioners, v. Louthan, 35 Okla. 407, 130 P. 139; Board of County Commissioners of Beaver County v. Culwell et al., 41 Okla. 712, 139 P. 979; Privet, Registrar of Deeds, et al., v. Board of County Commissioners of Grant County, 44 Okla. 523, 145 P. 323.

The said cases cited by the commission in the said opinion have been examined. They each and all involve the question of increase or decrease in salary or emoluments of a public official after he became such and during his term, none of them with the exception of one even discuss the question of duties germane or nongermane to the office of a public official, but turn each case upon section 10, article 23 of the Constitution hereinabove quoted, and hold that under the said section the salary and emoluments of the officers could not be changed.

Plaintiffs in their brief cite the case of Finley v. Territory, 12 Okla. 621, 73 P. 273. This case was decided by the Court of Oklahoma Territory long prior to the adoption of the Constitution of this state. That case involved the collections by the probate judge, and his duty to account for certain fees while acting in town-site matters, and it merely held that it was incumbent upon the said probate judge to account for all fees received by him, including those received from acting in town-site matters. The territorial court cited the case of United States v. Brindle, 110 U.S. 688, 28 L. Ed. 286,

and quoted from the said opinion as written by the Supreme Court of the United States which, omitting certain parts, is as follows:

"Brindle was appointed Receiver of Public Monies at Lecompton, Kansas, and while he was performing the duties of Receiver of Public Monies, he was appointed as a Special Commissioner to dispose of the Delaware Indian Trust Lands situated near Fort Leavenworth, Kansas. The Supreme Court of the United States held that he was entitled to a commission on sales of these lands in addition to his compensation as Receiver of Public Monies. It was expressly held in this case by the Supreme Court that it was no part of the duty of Brindle as Receiver of Public Monies at Lecompton, Kansas to sell the trust lands and receive the payments thereof . . . and hence, when Brindle was appointed to dispose of the trust lands, he was employed to render services in no way connected with the office he held and no additional duty was imposed upon him as Receiver of the Land Office . . . They were not one and the same office. Had it been a part of the duties of the Receiver of Public Monies at Lecompton, Kansas, to sell and dispose of Indian Trust Lands then certainly it would have been a part of Brindle's duties as Receiver of Public Monies to perform these additional duties and no additional compensation could have been allowed.

"The same doctrine was announced by the Supreme Court of the United States in Converse v. United States, 16 L. Ed. 192.

"In United States v. Saunders, 30 L. Ed. 594, it was decided by the Supreme Court of the United States that the Federal law prohibiting the allowance of additional pay or extra compensation to public officers has no application to two distinct offices, places or employments, each of which has its own duties and compensation, which offices may both be held by one person at the same time."

It will be noted this case, which is frequently cited by different states on the question of germane and nongermane duties of officers, turned upon the fact that Brindle held two separate and distinct offices, which was not prohibited by law, and that he was entitled to the compensation of both offices. We quote from this case because many of the cases cited on this question refer to it. In the case of Phelps v. Childers, 184 Okla. 421, 89 P. 2d 782, which is relied upon to support plaintiffs' contention herein, it is quoted on the question we are now discussing.

The second case since statehood, on which the opinion was turned upon the doctrine of germane and nongermane duties of a public official, was and is the said case of Phelps et al. v. Childers, 184 Okla. 421, 89 P. 2d 782. In citing the said case plaintiffs say that this court had under consideration a statute very similar to the one herein involved, providing that the Justices of the Supreme Court, elected at the general election in 1934, should compile certain procedural statutes and annotate the same fixing the compensation for such services at $2,500 annually, payable monthly, requiring the work as and when completed to be filed in the State Library. The court in said case held that such new duties or services were foreign to or beyond the scope of and not germane to the duties of the office of Justice of the Supreme Court, and the additional compensation provided for did not violate section 10, article 23, Oklahoma Constitution, though passed after they became officers (plaintiffs' brief, pp. 10 and 11).

It is not amiss to point out here that the said case of Phelps v. Childers was decided by a divided court, five members concurring, three members dissenting and one member absent. In the said Phelps case, this court (composed of Special Judges) dealt with House Bill 239, Session Laws 1936-1937, chapter 21, art. 1, p. 33, which became effective August 10, 1937. We quote from the said opinion:

"The bill provides for the revision and compilation of the civil, probate and appellate statutes of this State, recites the necessity of such revision,

directs the Justices of this Court elected in November, 1934, upon their written acceptance of the terms of the act filed with the Secretary of State to perform such services, fixes the compensation for such services at $2,500 annually, payable monthly, requires the work as and when completed to be filed in the State Library **and that the work must be completed by the second Monday in January, 1941."**

In that case the six Justices other than the three elected in 1934, were drawing a salary of $7,500 per year under an act of the Legislature passed prior to their going into office, while the three Justices elected in 1934 were drawing $5,000 per year as fixed before they went into office, and the $2-500 for the services required by the act would equalize the compensation of those three Justices with that of the other six members of the court.

Several cases cited in the said opinion are to the effect that the court cannot question the wisdom and propriety and the motives supposed to have inspired the passage of the act and that these are considerations to be addressed solely to the Legislature. As to these we have no quarrel.

Then the court, in the said Phelps case, proceeds to discuss the doctrine of germane and nongermane duties of public officials and quotes from other states, and holds that the duties required of the said three members of the Supreme Court were nongermane to the duties of their office and that the $2,500 per year provided for in the act of the Legislature did not fall within the inhibition of section 10, article 23 of the Oklahoma Constitution. In support thereof it cites many Kentucky cases, among them Coleman v. Hurst, State Auditor, 226 Ky, 501, 11 S.W. 2d 133; and from other states, Love, Attorney General, v. Baehr, 47 Cal. 364; Jennette v. Stevens, 34 Nev. 128, 116 P. 601; Board of County Commissioners of Creek County v. Bruce, 51 Okla. 541, 152 P. 125, heretofore discussed. It also cites the case of United States v. Brindle, 110 U. S. 688, 28

L. Ed. 286, and quotes from the said case as we have quoted hereinabove. It further cites the case of State ex rel. Trebby v. Vasaly, 98 Minn. 47, 107 N.W. 818. These are the cases cited in the said opinion on germane and nongermane duties. Then the opinion recites:

"When a statute imposes duties or calls for the performance of service that is nongermane and beyond the scope of the duties of the office as the same existed prior to the enactment of the statute, the one holding such office may not be required to perform the nongermane duty or service and cannot be disturbed in the enjoyment of his office for his refusal to do so."

Then in the same paragraph the opinion recites that where the duties are nongermane and the officer accepts and agrees to perform the nongermane duty or service, the act does not violate said constitutional provisions (that is, section 10, article 23, supra).

In the said case of Coleman, State Auditor, v. Hurst, cited in the Phelps case, supra, it is set out that in 1928 the Kentucky General Assembly, by enactment, established a "Judicial Council" composed of the Judges of the Court of Appeals and the Circuit Judges of the State, which Judicial Council was to study the judicial system of the state and the problems of administration confronting the courts and the Circuit Judges were required to submit to the said council a report setting forth the condition in the Circuit Courts over which they presided, the business dispatched, etc. It is true that the contention was made in the said case of Coleman, State Auditor, v. Hurst, that the said act violated a Kentucky constitutional provision known as section 235, forbidding changes in salaries of such state officers during the terms for which they were elected. It reviews numerous decisions of the Kentucky court for all but a half a century back, and in responding to the contention made that it violated the constitutional provision which reads "The salaries of public officers shall not be changed

during their term for which they were elected," the court said:

"If we should hold that the act creating the Judicial Council is unconstitutional we would have to overrule many cases and the Court would be compelled to depart from the principles announced in opinions from time to time for more than a quarter of a century."

This, of course, as the opinion discloses, refers to duties placed upon public officials nongermane to the duties of their office for which additional compensation was provided to be paid during the terms for which they were elected.

A review of some of these Kentucky decisions discloses that some of the opinions were based upon the conclusion reached by the Supreme Court of the United States in the Brindle case discussed supra.

We have examined not only the constitutional provision of Kentucky but also of Michigan, Nevada, Pennsylvania, Virginia, Illinois, and of California, these being states from whose courts citations are made in the Phelps case.

Section 235 of the Constitution of Kentucky provides:

"The salaries of public officers shall not be changed during their terms for which they were elected."

Article XV, Miscellaneous Provisions, sec. 9 of the Constitution of Nevada provides:

"The Legislature may, at any time, provide by law for increasing or diminishing the salaries or compensation of any of the officers whose salaries or compensation is fixed in this Constitution; provided, no such change of salary or compensation shall apply to any officer during the term for which he may have been elected."

Article III, sec. 13 of the Constitution of Pennsylvania provides:

"No law shall extend the term of any public officer, or increase or diminish his salary or emoluments, after his election or appointment."

Article VI, sec. 83 of the Constitution of Virginia provides:

"The salary of each officer of the executive department shall be fixed by law, and shall not be increased or diminished during his term of office."

Article V, sec. 23 of the Constitution of Illinois provides:

"The officers named in this article shall receive for their services a salary to be established by law, which shall not be increased or diminished during their official term."

Article V, sec. 19 of the Constitution of California provides:

"The Governor, Lieutenant-Governor, Secretary of State, Controller, Treasurer, Attorney-General, and Surveyor-General shall, at stated times during their continuance in office, receive for their services a compensation which shall not be increased or diminished during the term for which they shall have been elected."

Section 5 of article 5 of the Constitution of New Jersey provides:

"The Governor shall at stated times, receive for his services a compensation which shall be neither increased nor diminished during the period for which he shall have been elected."

Section 21 of article 6 of the Michigan Constitution provides:

"The Governor and Attorney-General shall each receive an annual salary of five thousand dollars. The Secretary of State, State Treasurer, Commissioner of the State Land Office and Auditor-General shall each receive an annual salary of twenty-five hundred Dollars. They shall receive no fees or perquisites whatever for the performance of any duties connected with the offices. It shall not be competent for the Legislature to increase the salaries herein provided."

While from the language used in these respective constitutional provisions, there were inhibitions against increasing the salaries of public officials

during their terms, we must not overlook the fact that all of these states were members of the Union long prior to the drafting of the Constitution of Oklahoma in 1906 and 1907, and which became the basic law of the State of Oklahoma on its admission November 16, 1907. We must not overlook the fact, which is well within the memory of many people not living in Oklahoma and some members of this court now sitting, that there were many able lawyers, members of the Constitutional Convention of Oklahoma, which drew and submitted the present Constitution of Oklahoma. It is hard to surmise that they were not, in a measure, familiar with the court decisions dating back a long number of years in the states from whose decisions quotations are taken in the said case of Phelps v. Childers. And it must not be overlooked that the language of section 10 of article 23 of the Oklahoma Constitution is couched in terms more convincing of its purpose and more definite and direct in its intendment than any of the constitutional provisions from which these quotations are taken. The intendment of a constitutional provision is as much a part thereof as the express language used. We again quote part of section 10 of article 23 of the Oklahoma Constitution:

"Except wherein otherwise provided in this Constitution, **in no case** (emphasis ours), shall the salary or emoluments of any public official," etc.

Constitutional provisions must necessarily be couched in brief and pointed language, and if the very evil of these opinions cited in the Phelps case were intended to be prohibited by this constitutional provision, we cannot conceive of language that might be used with more force and clarity than was the language used in section 10, article 23. In this connection it is not amiss to refer without citation of authority to the principle of constitutional construction, to wit: "That you must look at the evil and the remedy". The evil was increasing salaries under the doctrine of germane and nongermane du-

ties of public officials, and section 10, art. 23, supra, said: "In no case," meaning, of course, to the average intelligence of the citizenship of the state who were called upon to approve or disapprove the document by a vote, could have meant nothing more than that under no circumstances or pretext could the salary or emoluments of a public official be changed during his term of office.

If the plaintiffs' contention in the case now at bar should be sustained by this court, we do change the emoluments of public officials during their term of office when the constitutional provision clearly states "In no case" shall it be done.

We again point out that said constitutional provision does not stop by saying that the salary of a public official shall not be changed during his term, but it uses a much stronger and more comprehensive term, to wit, "or emoluments". This language is all embracing and in English the meaning of which is not confused by lexicons. They say in unison that emoluments mean "Profit, remuneration or income". It is not subject to dispute that the said legislative enactment undertakes to increase the profit or income of the plaintiffs. We think in the light of said constitutional provision, the doctrine of whether or not duties imposed are germane or nongermane has no place in the jurisprudence of Oklahoma, except that where duties are imposed upon public officials by legislative enactment, the nonperformance by such officials of nongermane duties would constitute no dereliction, but they have no place as a pretext or excuse for increasing the emoluments of any public official during the term for which he was elected. To engraft this doctrine in the face of this constitutional provision into the law of this state is tantamount to a judicial amendment of section 10 or article 23 of the Constitution, by adding thereto a proviso which would necessarily read, after the conclusion of the section as drawn: "Provided that if duties are imposed by the

Legislature upon public officials not germane to the functions and duties of their office additional emoluments may be allowed by the Legislature". That is what the nongermane doctrine means and such would place the emoluments of every public official subject to the discretion of each reoccurring Legislature and the legislative log-rolling which would follow therefrom. Clearly said constitutional provision intended to forestall and prohibit any such condition. If the nongermane doctrine sought to be made a part of the law of this state by the said two cases heretofore decided by this court becomes the settled law of this state by recurrent opinions of this court, then the said constitutional provision has little or no force to forestall the conditions clearly to be forestalled by its plain language.

The decisions relied on in the Phelps case, supra, are from foreign states. Its reasoning plucked the upas from foreign soil and engrafted it onto a branch of the basic law of Oklahoma, and its poison has dwarfed said branch almost into uselessness.

It must be noted in this case that said sections 1 to 3, both inclusive, provide for the compilation of the laws affecting oil and gas and the general orders of the Corporation Commission thereon. Can we gainsay the fact that in the minds of the authors of this bill there was a mental reservation that if this work could be successfully used as a pretext for adding to the emoluments of the plaintiffs, the same Legislature or the next could pass a bill reciting that the statutes and general orders and regulations of rates of cotton gins throughout the state had never been separately compiled and annotated and the Corporation Commissioners should do this work for which they should receive an additional $2,500 per annum.

And again, the Legislature would not be required to stop there. It could enact another provision reciting that the statutes, rules and regulations governing the manufacture and distribution of ice had never been compiled and annotated and the Corporation Commissioners would be required to do this work for which they should receive an additional emolument of $2,500 per year.

Nor would this be all. The Legislature has heretofore put the regulation of motor vehicles transporting passengers for hire under the jurisdiction of the Corporation Commission and the rates to be charged. Having received the green light from this court on the constitutionality of the instant act, the Legislature could declare that the statutes touching the regulation of motor vehicles had never been separately annotated and the general orders published and might require the Corporation Commissioners to do this for which $2,500 per year additional emolument should go to the members thereof. And numerous other provisions or enactments of the Legislature conferring jurisdiction upon the Corporation Commission of this state might be required to be separately compiled and annoted for which additional compensation of $2,500 per year might be allowed to the commissioners on the theory that the nongermane doctrine had all but written out of existence the plain provisions of section 10 of article 23 of the Oklahoma Constitution.

In the light of the plain language used in the said constitutional provision, it should be beyond the settled judgment of this court that the language of said constitutional provision was not intended to prohibit this very condition. The said language clearly means that the Legislature could not increase the emoluments of public officials as herein involved during the term of office then being served. This is true, however important the alleged added duties might be or however frivolous they might be, nor whether they were germane to duties theretofore imposed or not germane. The crux is the attempted increase of the emoluments of public officials and all such attempts though they may be bottomed on some pretext of added work fall within the clear intendment of the inhibition of the

said provision of the Constitution. For this court to hold as plaintiffs contend would be another marker on the road that leads away from constitutional safeguards and towards government by legislative discretion only.

The writers of the Constitution of Oklahoma were too wise to leave the welfare of the Treasury of the state to such legislative meandering as high public officials with their well-known influence on legislative members could bring about. Some of the members of the Constitution makers may not have been as erudite in the use of English words as Noah Webster, but they did write it down, "In no case shall the salary or emoluments of any public official be changed after his election or appointment or during his term of office". Granting the plaintiffs' prayer would certainly change the profit, remuneration, and income to these officials other than what it was at the time they took the oath of office.

In this connection we call attention to the fact that one of the rules of constitutional construction is that effect should be given to every part and every word and, unless there is some clear reason to the contrary, no portion of the fundamental law should be treated as surplusage. Holmes v. Jennison, 10 U.S. (L. Ed.) 579; Cohen v. Virginia, 5 U. S. (L. Ed) 257; Hurtado v. People of California, 110 U. S. 516, 28 U. S. (L. Ed.) 232; Hallinger v. Davis, 146 U. S. 314, 36 U. S. (L. Ed.) 986; Tuttle v. National Bank of Republic, 161 Ill. 497, 44 N.E. 984.

Counsel for plaintiffs in oral argument in effect say that the phrase found in said section 10, "In no case", means nothing and is mere surplusage. We cannot concur in this position. Words and phrases used in constitutional provisions are to be given their ordinary significance, or what is ordinarily meant by their use. To illustrate—one Mr. Brown approaches Mr. Smith and makes vigorous request that Mr. Smith do a certain thing; Mr. Smith with equal vigor, replies, "in no case" would I do that. What would Mr. Brown understand Mr. Smith to mean? Mr. Brown would immediately know that Mr. Smith meant that under no circumstances or emergency or pretext would he, Smith, do what Mr. Brown had requested him to do.

We note the contrast in the clauses used at the beginning of the said section:

"Except wherein otherwise provided in this Constitution, **in no case** shall the salary or emoluments of a public official be changed after his election or appointment, or during his term of office".

The phrase "in no case" meant just what Brown understood Smith to mean in the above illustration, to wit, that, under no circumstances, emergency or pretext should the salary or emoluments of any public official be changed during his term of office.

In the said cited case of Holmes v. Jennison, 10 U. S. (L. Ed.) 579, in discussing the constitutional question there involved, the Supreme Court said:

"In expounding the Constitution of the United States, every word must have its due force and appropriate meaning; for it is evident from the whole instrument that no word was unnecessarily used or needlessly added. The many discussions which have taken place upon the construction of the Constitution have proved the correctness of this proposition. . . . No word in the instrument, therefore, can be rejected as superfluous or unmeaning".

The principle quoted, so far as we are advised, is the definitely accepted rule of constitutional construction, to wit, that every word and phrase in the constitutional provision must have a meaning and that meaning is the ordinary acceptation of the word or phrase used.

This court, on June 30, 1934, handed down an opinion "Per Curiam." At the bottom of the said opinion, reported in 167 Okla. 287, 291, 29 P. 2d 610, 614, it is recited:

"This opinion is delivered 'per curiam' for the reason it has been prepared, after careful consideration of the issues, by the joint efforts of each and every member of the court, and reflects their composite views."

This was a suit by Edwards et al. v. Carter, State Auditor, for mandamus to compel the auditor to pay the salaries of the members of the Criminal Court of Appeals of Oklahoma as fixed by legislative enactment before the term of office of the members began, in the face of the fact that the Legislature appropriated less money to pay the salaries of the members of the said court than was fixed by law when their terms of office began. This court held definitely that under the said section 10, art. 23, the salaries of the plaintiffs therein could not be changed, although the Legislature neglected to appropriate the full amount.

After quoting the said section 10 art. 23, this court said:

"This constituted a limitation and restriction upon the power of the Legislature. Any attempt, directly or indirectly, by the Legislature to evade the force and effect of that constitutional limitation and restriction is ineffective and void. There is no principle of our government that is better settled than that the salary or emoluments of a public official cannot be changed during his term of office in violation of such a constitutional prohibition."

This court and other courts are reluctant to overrule opinions if they are numerous and of long standing, but, as pointed out above, there are only two cases in the reported decisions of the State of Oklahoma which undertake to turn the decision upon the doctrine of nongermane duties — these are the Bruce case, supra, and the Phelps case, supra. All such provisions are made for the benefit of the officers and the people, and this court should, without equivocation, declare the Constitution. The Bruce case, supra, should have been turned on said section 10 and the discussion otherwise had no place therein. The additional compensation of $2,500 per year to three members of the Supreme Court until the first Monday in January, 1941, has long since ceased its purpose and the $2,500 per year mentioned in the said House Bill 239 involved in the Phelps case has been merged into the regular salary of the said three members of the Supreme Court in that their term of office expired and new terms were begun. We therefore say that the nongermane doctrine on which the Bruce case and the Phelps case turned has no place in Oklahoma jurisprudence as an excuse for adding emoluments to officers, in contravention of section 10, art. 23 of the Constitution, and should be overruled.

The Corporation Commission.

The Corporation Commission of the State of Oklahoma is an instrumentality of government which owes its existence solely to the Constitution of this state. It is a special tribunal which has delegated legislative, executive and judicial powers. Its duties are defined by the Constitution, and under the permissive authority of said document, additional duties were imposed upon the said commission by the Legislature of the State of Oklahoma. It is composed of three members, the plaintiffs in this case. Sections 1 to 34, both inclusive, of article 9, create the commission and prescribe the constitutional duties of said commission, together with certain provisions for appeal therefrom and other provisions not strictly duty-defining.

Plaintiffs in the instant case in their reply brief (page 6) say:

"The Enrolled House Bill No. 172 is an Act relating to the Corporation Commission of the State of Oklahoma . . . Some of the duties prescribed are not within the scope of the duties required prior to the enactment but they relate to the Corporation Commission . . ."

This because the officers are such by reason of the office they hold.

If this court should adhere to the doctrine of nongermane duties on which the case of Phelps et al. v. Childers, supra, turned, the said case is not controlling if indeed it be at all persuasive in the instant case.

Section 16 of article 9 fixes the qualifications of commissioners:

"To be resident citizens of this State for over two years next preceding the election, and qualified voters under the Constitution and laws, and not less than thirty years of age; nor shall such commissioners, or either of them, be, directly or indirectly, interested in any railroad, street railway, traction line, canal, steam boat, pipe line, car line, sleeping car line, car association, express line, telephone or telegraph line, operated for hire, in this state, or out of it or any stock, bond, mortgage, security, or earnings of any such railroad, street railway, traction line, canal, steam boat, pipe line, car line, sleeping car line, car association, express line, telephone or telegraph line, compress or elevator companies; and if such Commissioner shall voluntarily become so interested, his office shall become vacant; and if any Corporation Commissioner shall become so interested otherwise then voluntarily, he shall, within a reasonable time, divest himself of such interest; and failing to do this, his office shall become vacant. Nor shall any such Commissioner hold any other office under the government of the United States, or of this State or any other state government, and shall not, while such Commissioner, engage in any occupation or business inconsistent with his duties as such Commissioner."

It must be noted from said quoted qualifications of commissioners, that after the specific qualifications, there is the general or omnibus requirement of the last sentence:

"Nor shall any such commissioner hold any other office under the government of the United States, or of this State or any other state government, and shall not, while such Commissioner, engage in any occupation or business inconsistent with his duties as such Commissioner".

This omnibus provision means nothing more nor less than this—that no such commissioner shall engage in any employment not in harmony with, or in furtherance of the performance of, or in line with, the obligatory service required by the constitutional provisions and such legislative enactments in pursuance of the permissive authority granted in article 9 of the Constitution.

The lexicons define "inconsistent" as "lacking coherence or agreement". The word "duty" or "duties" is defined as meaning "obligatory service". So to clarify the meaning of the latter part of said section 16, the same should read: That no such commissioner shall engage in any employment lacking coherence with or lacking agreement with his obligatory duties as such commissioner. Obligatory duties is service required of the officer or individual on whom the duty may rest, either by operation of law or the common amenities of human society. The plaintiffs herein, after their election as set out in their petition, took the constitutional oath of office as prescribed for Corporation Commissioners and their election coupled with their said oath of office required under the Constitution and statutes made under the permission of the Constitution certain obligatory service from the said commissioners referred to as duties and the said inhibition in the said last-quoted clause of said section 16, article 9 would inhibit such officers, to wit, Corporation Commissioners, from carrying out the work imposed on them by the said sections 1 to 3, inclusive, of House Bill 172, for the reason as heretofore stated that the said work is not coherent with or in agreement with their obligatory service under the Constitution and statutes.

The said sections 1 to 34, both inclusive, referred to hereinabove, prescribe the constitutional duties of the Corporation Commission (subject to repeal or change by the Legislature), the method of appeal from the orders

of said commission, the qualifications of said commissioners and oath of office, and the said limitation upon their authority to engage in any employment or occupation not in agreement with their duties as such commissioner.

Palpable Duplications Of Compilations as an Excuse to Increase Emoluments.

Certainly the said sections of the act in question, to wit, said sections 1 to 3, both inclusive, do not constitute an enactment of the Legislature to vest the Corporation Commission or Commissioners with any of the powers and authority granted in article 9 of the Constitution, or added legislative duties in line therewith, and by reason thereof the said act undertaking to require duties as therein defined to be performed by the commissioners is without legislative authority under the Constitution and entirely void.

We have not overlooked section 36 of article 5 of the Constitution. Reference to this section has been made in several cases by this court, but none of them have analyzed it or put any definite construction thereon. They all cite the opinion of this court in State ex rel. Caldwell v. Hooker, rendered in 1908, 22 Okla. 712, 98 p. 964. This is the first opinion which refers to section 36 of article 5. It expressly recites:

"The intention of the lawmaker should be diligently sought for under the settled rules of construction; but if, after determining what such intention was, it appears the act is clearly in conflict with the organic law, the court should not hesitate to strike it down. It is as much the duty of the court to declare invalid an unconstitutional act as it is to uphold one in accord with the state's charter".

We might comment further as to sections 1 to 3, both inclusive, of said House Bill 172, that this is a very remarkable statute, to say the least of it, and it might be seriously doubted whether it ought not to be held void on the further ground that it is so vague, indefinite, and uncertain that this court is unable to determine with any reasonable degree of certainty what the Legislature intended, or, on the other hand, it is so incomplete in its provisions that it can not be executed. People v. Sweitzer (Ill.) 107 N.E. 902; State v. Ashbrook, 154 Mo. 375, 55 S. W. 627; State v. Excelsior Springs Water Co., 212 Mo. 101, 110 S.W. 1079; State v. Board of State Canvassers (Wis.) 150 N.W. 542.

This said statute is vague and indefinite in this, among other things, to wit, it provides that the laws of Oklahoma relating to oil and gas and the rules and regulations promulgated by the Corporation Commission touching the same have never been compiled and annotated, and therefore the duty is placed on the Corporation Commissioners to make such compilation of the laws and the general orders, rules and regulations adopted by the commission. It must be noted that the said statute does not say whether or not the general orders, etc., effective at any particular date, or whether or not they should compile all the orders, rules and regulations at any time made, whether they be inforce at the time of the alleged compilation or not. In this connection we point out that section 25 of article 9 of the Constitution provides that the Corporation Commission shall make annual reports to the Governor of its proceedings in which reports it shall recommend from time to time such new or additional legislation in reference to its powers or duties, or the creation, supervision, regulation or control of corporations, or to the subject of taxation as it may deem wise or expedient, or as may be required by law and in connection therewith. By section 18 of article 9 of the Constitution, it is provided, without quoting, that before the commission shall prescribe any general order, rule, regulation or requirement, the contemplated general order, rule, regulation or requirement shall first be published for four consecutive weeks in one or more newspapers of general circulation published in the county in which the Capitol may be located, and every per-

son interested be given an opportunity to be heard, and it then concludes that such order, rule, regulation, etc. "Shall also, as long as it remains in force, be published, in each successive annual report of the commission." So we find that each year the annual report made to the Governor must, among other things, set out all such rules, orders and regulations that are then in force.

It is difficult to perceive in the light of these sections of the Constitution, whether it shall be the duty of the commissioners to compile all the orders whether they be in force or not. The said section further provides that such compilation "shall be from time to time supplemented so as to include any changes occasioned either by legislative enactment, judicial interpretation or orders issued by the Corporation Commission". This part of the statute does not say whether or not the orders, rules and regulations in force at the time the compilation is made shall be supplemented so as to include any changes or whether or not all orders together with the changes, etc., shall be embraced therein, nor how long it shall last or when completed.

In this connection we must point out that it is again a very remarkable statute for that under section 43 of article 5 of the Constitution of Oklahoma it is provided:

"The Legislature shall in the year 1909 and each ten years thereafter make provision by law for revising, digesting and promulgating the statutes of the state".

This provision has, beginning with the Legislature of 1909 and continuing to the Legislature of 1939, provided for revising, digesting and promulgating the statutes of Oklahoma, the last being provided for and compiled as Oklahoma Statutes 1941, which the annotators classified by titles which embrace all the oil and gas laws of the state up to that date, and doubtless the Legislature in 1949 will provide for another compilation and annotation of all laws including those governing oil and gas and

the meeting of the said Legislature is less than a year removed from the present date.

For performing these vague, indefinite and uncertain alleged duties, the said act further provides that each member of the Corporation Commission shall receive $2,500 annually. It must be noted that there is no time fixed by this enactment as to when these alleged duties shall be completed. It may continue until such time as the Legislature has provided for $2,500 a year increase in the salaries of the Corporation Commissioners and until such increase shall be effective as to each member of the Corporation Commission.

Of course, the Legislature is not prohibited from increasing the salaries of the members of the Corporation Commission, but such increase could not become effective until the expiration of the term of office of the commissioner elected in 1946 who went into office in January, 1947, and that time calculated from the effective date of this act would take at least six years before the compensation of $2,500 per year for the compilation referred to in the act would cease. And again we must point out that the said statute does not provide that if, when the salary as to each member is directly increased, and it is effective as to each member, that the work or duties therein provided for shall continue thereafter. Certainly, during that six years under said section 43 of article 5 of the Constitution the Legislature shall have provided for a new compilation, revision and annotation of the statutes of Oklahoma, and the situation would be nothing less than this: That the compilors of the statutes made under legislative enactment under said section 43, art. 5 would themselves be compiling, annotating and revising the oil and gas laws as well as all the other statutes of the state at the same time that the Corporation Commissioners are compiling the oil and gas laws of the state and at the same time that their annual report made to the Governor as pro-

vided by section 25 of article 9 shows all the general orders, rules and regulations of the Corporation Commission then in force.

While we do not care to turn this opinion upon the proposition of the vagueness and indefiniteness of the legislative provision, we have pointed this out because it indicates to us that not even the Corporation Commissioners themselves can understand what they are to do under this act; or how long it shall continue; that it is a mere subterfuge and an excuse or pretext for adding $2,500 per year as emoluments of plaintiffs over and above that already allowed by law.

We advert to section 10 of article 23 quoted hereinabove. In Williams Annotated Constitution, compiled shortly after the Constitution of Oklahoma was drawn, after this section it is pointed out that it was patterned after the Constitution of Colorado of 1876 and the Constitution of Wyoming of 1889, and further points out in the annotation that it is all but identical with the Pennsylvania Constitution of 1873, and cites the case of Apple v. Crawford County, 105 Pa. St. 300.

The Colorado constitutional provision, after which it is patterned, section 30, art. 5, provides:

"Except as otherwise provided in this Constitution, no law shall extend the term of any public officer or increase or diminish his salary or emoluments after his election or appointment."

In the case of Board of County Commissioners of Converse County v. Burns, 3 Wyo. 691, 30 P. 415, the Supreme Court of Wyoming states that section 32 of article 3 of the Wyoming Constitution was taken from the Colorado Constitution, and that both the Colorado and Wyoming Constitutions are identical with the Pennsylvania Constitution, section 13, article 3 excluding this clause: "Except as otherwise provided in this Constitution".

In the said case of Apple v. Crawford County, 105 Pa. St. 300, cited, supra, in Williams Annotated Constitution of Oklahoma, under section 10 of article 23, the Supreme Court of Pennsylvania held:

"The word 'emolument' in said Article 3, Section 13, imports any perquisite, advantage, profit or gain arising from the possession of any office."

Certainly, in the case at bar, the additional compensation arises by virtue of the plaintiffs being members of the Corporation Commission of Oklahoma.

Shortly after Wyoming was admitted as a state, the Supreme Court of Wyoming, in the case of Board of Commissioners of Converse County v. Burns, 3 Wyo. 691, 29 P. 894, said:

"The purpose of the constitutional provision inhibiting a change in the compensation of a public officer during his term of office was to protect the individual officer against legislative oppression, and to guard the Legislature from the gainful schemes of officials. State v. Kelsey, 44 N. J. Law 31. Party rancor, personal spleen, enmity, or grudge, might work to harass and cripple the officer by reducing his compensation during his term of service; (as apparently was the case in Edwards et al. v. Childers, supra, and Riley v. Carter, supra—ours), while, on the other hand, partisan feeling, blood or business relations, might sway the members of the Legislature, and cause the bestowal of an unmerited increase, without this wise restriction. Without it, there would be no limit to the control of the Legislature, except, possibly, where a salary had been so reduced as practically to abolish the office. . . .

"The authorities all take the ground that no law or procedure under the law can be used as a cloak for constitutional violations. The effect and operation of a law must be looked to, as well as its naked provisions, and nothing should be tolerated under color of a law that is a palpable evasion of the Constitution. It would be a dangerous practice, at the threshold of our existence as a state, to so loosely construe

a statute, and to set aside a wise and healthy constitutional restriction and limitation of legislative power."

See, also, Henderson v. Board of Commissioners of Boulder Co., 51 Colo. 364, 117 P. 997; Commonwealth v. Mathues, 210 Pa. 372, 59 Atl. 961.

The writer has discussed the act in question which is pleaded by plaintiffs in their petition under three separate headings as hereinabove set out.

Irrespective of the position taken by the writer hereinabove set out, there remains a question which the writer considers entirely controlling in this action.

The writer is not disposed to burden this opinion with the recitation of the various acts of the Legislature of Oklahoma touching the conservation of oil and gas prior to the Act of 1935. H. B. 274 of the legislative Session of 1935, p. 239, which is found in Okla. Stat. Ann., Tit. 52, p. 441, which is entitled "Conservation of Oil and Gas."

Section 81 of Tit. 52, Okla. Stat. Ann., provides for certain changes of names of officers as designated by the Session Laws of 1933, that is to say, in all places in the previous act where the words "proration umpire' are used, the same shall be construed to mean "conservation officer", and where the words "assistant proration umpire" are used, the same shall be construed to mean "assistant conservation officer", and where the words "proration attorney" are used, the same shall be construed to mean "conservation attorney", and where the words "deputy proration umpire" are used, the same shall be construed to mean "deputy conservation officer", and so forth, as set out in said section. This Act of 1935 reenacts numerous provisions of the Act of 1933, touching the conservation of oil and gas, defining ways thereof, the power of the Corporation Commission over the same, the appointment of certain officers to enforce the provisions of the conservation law, defining the duties of the respective officers mentioned in the said act, providing their salaries, expenses, and so forth. It also provides for the employment of stenographers, clerks, and so forth.

Titl. 52, sec. 133, Okla. Stat. Ann., provides:

"There is hereby created in the State Treasury a fund to be known as the 'Conservation Fund', which shall consist of all moneys that may be payable to said fund by law, and there shall be paid therefrom all salaries and expenses of the Conservation Officer, his Assistant Conservation Officer, Deputy Conservation Officers, and employees, and the Conservation Attorney, and the salaries of reporters, stenographers and clerks authorized by this Act to be employed, and such other items as are or shall be authorized by law to be paid therefrom in connection with the enforcement of the provisions of this Act."

Tit. 68, sec. 1218L, provides for the levy of a tax which expired June 30, 1943, but which was afterwards re-enacted. The said original act provided that there is levied an excise tax of 1-8 of one cent per barrel on each barrel of petroleum oil produced in the State of Oklahoma after the passage and approval of the act. Such excise tax of one-eighth of one cent per barrel shall be reported to and collected by the Oklahoma Tax Commission, and so forth. And section 1218m of said title provides that all funds derived from the levy of said tax of 1-8 of one cent per barrel on petroleum oil produced in the state shall be deposited with the State Treasurer who shall credit and apportion the same as follows: 7-8 to a separate and distinct fund to be known as the "Conservation Fund"; and 1-8 to a separate and distinct fund to be known as "The Interstate Oil Compact Fund of Oklahoma", and that all moneys to accrue to the "Conservation Fund" under the provisions of this act, together with all moneys remaining unexpended in the "Conservative Fund" created under the provisions of chapter 132, Session Laws 1933, as reenacted by article 2 of chapter 59,

Session Laws of 1935, and again re-enacted by article 2 of chapter 59 of the Session Laws of 1936-37, and as again re-enacted by article 7, chapter 66, Session Laws 1939, are hereby appropriated and shall be used for the payment of salaries and expenses, including premiums on surety bonds as are required by law, of the Conservation Officer, Assistant Conservation Officer, Deputy Conservation Officer, Conservation Attorneys, reporters, stenographers and clerks, and all items of office expense and office supplies, including stationery, telegraph and telephone, postage and printing, and all other items of expense as fixed and authorized by the provisions of chapter 131 of the Session Laws of Oklahoma, 1933. This act was further re-enacted, with some modification, by the Legislature of 1947, as shown by the cumulative annual pocket part to Tit. 68 Okla. Stat. Anno., and this revision or re-enactment as found in section 1220.1 on excise tax on oil, and this last enactment of the Legislature provides that there is hereby levied an excise tax of one mill per barrel on each barrel of petroleum oil produced in the State of Oklahoma which is subject to gross production tax. Such excise tax of one mill per barrel shall be collected by the Oklahoma Tax Commission in the same manner as provided by law for the collection of gross production tax.

Section 1220.3 provides that all moneys derived from the levy as set forth just hereinabove shall be deposited with the State Treasurer who shall credit and apportion the same as follows: 6-7 as derived from petroleum oil and natural gas to a separate and distinct fund to be known as the "Conservation Fund"; then it provides that all moneys to accrue to the "Conservation Fund" under the provisions of this act, together with all moneys remaining unexpended in the "Conservation Fund" created under the various preceding acts named therein, are hereby apportioned and shall be used for the payment of salaries and expenses, including premiums on surety bonds

as are required by law of the employees of the Conservation Department provided for by statute, and all items of office expense and office supplies, and so forth, and all expenses necessary to administer and enforce any other statutes of the state enacted to conserve oil and gas, but no moneys shall be paid out of said "Conservation Fund" until a claim therefor has been itemized and verified by claimant and approved by the Conservation Officer and the Corporation Commission, and when so approved the State Auditor shall draw his warrants therefor upon the State Treasurer, and the same shall be paid out of the "Conservation Fund" hereby created.

Section 19 of article 10 of the Constitution of Oklahoma provides:

"Every act enacted by the Legislature, . . . levying a tax shall specify distinctly the purpose for which said tax is levied, and no tax levied and collected for one purpose shall ever be devoted to another purpose."

We do not car to burden this discussion with the citations of numerous authorities from this court and other courts holding that said section of the Constitution is mandatory. These various cases may be found in the notes under section 19, art. 10, Okla. Stat. Anno. "Constitution", and also under Williams' Anno. Constitution of Oklahoma, as revised under the said section of the said article of the Constitution.

We have briefly traced enactment of the Conservation laws as to oil and gas through the various sessions of the Legislature of Oklahoma without specifically pointing out the same in their entirety together with the last expression of the Legislature of this state in 1947, and all of these enactments levying this Conservation Fund specifically provide how this fund shall be used. These various acts levying this tax in the nature of gross production tax on oil and gas for a specific purpose clearly comply with said section 19 of article 10, quoted supra, and of course without citation

of additional authority this money cannot be diverted to any other use.

We now approach the act of the Legislature in the instant case which is pleaded by the plaintiffs in their suit for mandamus against the paying officers of the state. Said section 2 of said act as quoted hereinabove provides that the $2,500 paid to each member of the Corporation Commission annually shall be paid from the Conservation Fund" until such time as said compilation and annotation has been completed, or until such time as an act of the Legislature of this state providing for an equivalent increase in pay out of the general revenue fund shall be effective as to each member of the Corporation Commission.

Clearly the fund sought to be collected by the claims pleaded by the plaintiffs prior to July 1, 1947, under this act could be paid from no other fund except the "Conservation Fund" provided for as hereinabove set out. The defendants would not be authorized to divert the moneys in the "Conservation Fund" provided for a specific purpose to the payment of claims such as here involved. This would be a plain diversion of the funds to a purpose other than that for which they were levied, in violation of section 19, art. 10 of the Constitution.

Therefore, plaintiffs' prayer for mandamus should be denied.

---

POWELL, Special Justice (dissenting). The facts have been stated.

I concur in the conclusion reached by Justice Branson that the writ should be denied, but I find nothing wrong with the germane and nongermane theory as such. Anyway, this court is committed to that rule. The difficulty has been in determining what added duties may be said to be germane and what added duties may be said to be nongermane.

The Legislature deemed the annotating duties prescribed by House Bill No. 172, which we will quote hereinafter, to be germane to the duties of the commissioners as conservators of the oil and gas resources of the State of Oklahoma. If such duties are **nongermane** to the duties of Corporation commissioner as contended by the plaintiffs, then, to pay them from the Conservation Fund would violate article 10, section 19 of the Constitution of Oklahoma, as said provision forbids devoting such funds to any purpose other than the purpose for which collected. See action 19, art. 10, reading:

"Every act enacted by the Legislature, and every ordinance and resolution passed by any county, city, town, or municipal board or local legislative body, levying a tax shall specify distinctly the purpose for which said tax is levied, and no tax levied and collected for one purpose shall ever be devoted to another purpose."

Justice Branson, in his dissenting opinion, contends that to pay the plaintiffs from such fund would violate the above constitutional provision. I think not, for the reason that the duties are germane; that is, in line with the duties of the individual members of the commission as Corporation Commissioners, and the annotating duties prescribed are for the purpose of aiding in the conservation of the oil and gas resources of the state, as will be hereinafter demonstrated, but being germane duties, the commissioners may not be paid the extra emoluments during the current term of office in which the legislation was enacted, for to do so would violate another provision of the Constitution of Oklahoma, being section 10, art. 23.

We arrive at the same results as Justice Branson, but for different reasons.

I recognize that the reason for permitting an occupant of an office to perform duties nongermane to that office and receive pay therefor during the current term in which the said duties are provided, without violating the familiar constitutional provision (sec. 10,

art. 23 of the Okla. Const.) is that the duties have no affinity with the main office and are the same as two separate offices, if not actually two separate offices, but I do not find it necessary to determine whether or not admitted nongermane duties might not by operation of law be treated as germane where it is made a prerequisite to the performance of such nongermane duties that one be an occupant of the particular office, because in the present case I am forced to the conclusion that the added duties **are germane** to the office.

Section 10 of article 23 of the Oklahoma Constitution reads:

"Except wherein otherwise provided in this Constitution, in no case shall the salary or emoluments of any public official be changed after his election or appointment, or during his term of office, unless by operation of law enacted prior to such election or appointment; nor shall the term of any public official be extended beyond the period for which he was elected or appointed; provided, that all officers within this State shall continue to perform the duties of their offices until their successors shall be duly qualified."

Overall, we should keep in mind the purposes of section 10, art. 23 of the Constitution of Oklahoma, and similar provisions in other states, ably stated in 43 Am. Jur. 350, as follows:

"The purpose of constitutional provisions against changing the compensation of a public officer during his term or incumbency is to establish definiteness and certainty as to the salary pertaining to the office, and to take from public bodies therein mentioned the power to make gratuitous compensation to such officers in addition to that established by law. It is deemed that as a general proposition, better service will be rendered if the matter of salary is laid at rest at the outset. In such situation, an incumbent and his friends have no incentive to attempt by improper means to bring about an increase, nor are other persons, whether their motives are prompted by economy or vindictiveness, moved or induced to attempt to bring about a reduction.

Limitations of this type are designed to establish the complete independence of the officers affected by them, and to protect them against legislative oppression which might flow from party rancor, personal spleen, enmity, or grudge."

We see that this provision of the Constitution is a two-edge sword, acting on the one hand to protect incumbents in office from having their compensation so reduced as to drive them from office, and on the other hand to protect the taxpayers from their influence, once in office, over legislators. No doubt public officers in many cases are definitely underpaid, but the Legislature should recognize this and remedy the situation, and as much as possible free from the influence of groups in official position who would be directly affected by the legislation.

The previous duties imposed upon members of the Corporation Commission by the Constitution and statutes of the state, are succinctly stated by the plaintiffs in one of their briefs filed herein, as follows:

"By the provisions of Section 15, Article 9, of the Constitution a Corporation Commission was created. By Section 18 of said article the Commission was vested with power and authority and charged with the duty of supervising, regulating and controlling all transportation and transmission companies doing business in the state in all matters relating to performance of their public duties and their charges therefor. The Constitution, as originally adopted, imposed no duties upon the Corporation Commission in regard to oil and gas conservation; however, by Section 19 of Article 9 the Legislature was authorized to vest the Corporation Commission with additional powers and to charge it with other duties not inconsistent with the Constitution. Section 35, Article 9, of the Constitution authorized the Legislature by law from time to time to alter, amend, revise or repeal Sections 18 to 34, inclusive, of Article 9, provided that no amendment so made should contravene the provisions of any part of the Constitution other than said sections last above referred to, or any amend-

ments thereof. Our Supreme Court has held specifically that laws imposing upon the Corporation Commission of Oklahoma duties in regard to the conservation of oil and gas have the effect of amending Section 18 of Article 9 of the Constitution by broadening the power and authority of the Commission. Russell v. Walker, 160 Okla. 145, 15 P. 2d 114.

"The official duties of the Corporation Commission in the field of oil and gas conservation are to be found in various statutes beginning with the Act of 1913. Although these powers and duties could be enumerated in much greater detail, generally it can be said that they consist of the following: (1) The duty to prevent waste of oil and gas, as defined in Title 52, Section 85, Oklahoma Statutes Annotated; (2) The duty to prevent waste of gas, as defined in Title 52, Section 86; (3) The duty to regulate the taking of oil and gas so that each owner in a common source of supply may recover only such oil and gas as may be produced without waste and without drainage not compensated by counter-drainage. Title 52, Section 87, Oklahoma Statutes Annotated. (4) The duty to provide for the proper spacing of well to prevent waste and to protect correlative rights. Title 52, Section 87, Oklahoma Statutes Annotated; (5) The duty to promulgate such orders, rules and regulations applicable to each common source of supply as it may find necessary or proper and to make general orders, rules and regulations applicable alike to all common sources of supply in the state."

What are the new duties that are claimed to be nongermane and foreign to the office of Corporation Commissioner?

Sections 1 to 3 of Enrolled House Bill No. 172 of the 1947 Legislature, approved with the emergency, read as follows:

"Section 1. Inasmuch as the laws of the State of Oklahoma relating to oil and gas and the rules and regulations promulgated by the Corporation Commission pursuant thereto, have never been compiled and annotated, **it shall be the duty of members of the Corporation Commission of Oklahoma to prepare, in such manner as they deem proper,** an annotated compilation of all the oil and gas laws of Oklahoma and the general orders, rules and regulations adopted pursuant thereto by the Corporation Commission of Oklahoma; said compilation and annotations to be supplemented by proper supplementary notes. Same shall be filed in the State Library as a public record, and as such shall be subject to inspection by the public. Said annotated compilation shall be published and shall be distributed free to persons interested therein, and shall be from time to time supplemented so as to include any changes occasioned either by legislative enactment, judicial interpretation, or orders issued by the Corporation Commission; **Provided further that before said Commissioners shall be authorized or required to perform the services defined by this Act, same to be performed so as not to interfere with their regular official duties, they shall each file a certificate in the office of the Secretary of State, setting forth their willingness to perform said services.**

"Section 2. Each of said members of the Corporation Commission shall receive as compensation for the service required by this Act the sum of Twenty-five Hundred Dollars ($2,500.00) annually, payable monthly; such sums to be paid from the Conservation Fund, until such time as said compilation and annotation has been completed or until such time as an act of the Legislature of this State providing for an equivalent increase in pay out of the general revenue funds shall be effective as to each member of the Corporation Commission, whichever time is shorter.

"Section 3. The cost of publishing the annotated compilation provided for herein shall be paid from the Conservation Fund." (Emphasis ours.)

This court is committed to the rule first announced in Board of County Com'rs of Creek County v. Bruce, 51 Okla. 541, 152 P. 125, and later in the case of Phelps v. Childers, State Auditor, 114 Okla. 421, 89 P. 2d 782, holding:

"A public officer is bound to perform the duties of his office for the compensation fixed by law. This is true as

to additional duties imposed upon the office by the Legislature after he enters upon his term, **provided such duties are germane**". (Emphasis ours.)

It was held in Russell v. Walker et al., 160 Okla. 145, 15 P. 2d 114:

"Under the provisions of article 9 of the Constitution, the Corporation Commission is vested with legislative, executive, and judicial power. . . ."

In commencing our study of this subject, we are confronted with a wilderness of cases from other jurisdictions involving constitutional provisions similar to section 10, art. 23 of the Oklahoma Constitution, and the cases and text-books are replete with quotations of satisfactory and relevant rules of law on the subject, but a study of the facts in the various cases leaves one mystified if an attempt is made to reconcile the reasoning in support of the rule.

We can only expect a correct solution of this case for this jurisdiction by a careful study of the basic authorities that this court has relied on covering the germane and nongermane test in determining the constitutionality of a particular act of the Legislature.

It might not be amiss to first consider the definition of the term "germane" as contained in Webster's New International Dictionary, as follows: "1. Near, Akin. 2. Closely allied; appropriate, relevant." And in Roget's International Thesaurus, as follows: "related, connected, implicated, associated, affiliated, allied; in touch with, . . . pertinent to the point or purpose, bearing upon, applicable, relevant, admissible."

See Words and Phrases, First Series:

"Literally, 'germane' means akin; closely allied. It is only applicable to persons who are united to each other by the common tie of blood or marriage. When applied to inanimate things, it is, of course, used in a metaphorical sense, but still the idea of a common tie is always present. Thus, when properly applied to a legislative provision, the common tie is found in the tendency of the provision to promote the object and purpose of the act to which it belongs. Any provision not having this tendency, which introduces a new subject matter into the act, is not germane to it. It is an error to suppose that two things are, in a legal sense, germane to each other, merely because there is a resemblance between them, or because they have some characteristic common to them both."

"Legislation affecting the boundaries of cities and villages is not germane to that affecting the boundaries of townships. Where the Legislature had the right to provide for the change of township boundaries, this right did not carry with it, as an incident, the power to change the boundaries of cities and villages; the change of the latter not being necessary to effectuate a change of the former, or at least to promote such object. Dolese v. Pierce, 16 N. E. 218, 220, 125 111.140."

And said the court in City of Chicago v. Reeves, 220 Ill. 274, 77 N.E. 237:

"Literally 'germane' means 'alike', 'closely allied', and when applied in the sense in which the word is used [in an amendment of a city charter creating a municipal court] it signifies that the changes in the articles amended by implication are such as are calculated to promote the object and purpose sought to be accomplished by express amendment."

I do not feel that we are called upon to reconcile the arguments and theories of the numerous cases on the subject. I think that would be impossible. Many times courts reaching the same conclusion did so by different reasoning. In most of the cases the fact situation will not be found to be the same. Each case is truly a separate case.

As heretofore stated, this court is committed to the germane and nongermane theory or test first mentioned in this jurisdiction in the case of Board of County Commissioners of Creek County v. Bruce, 51 Okla. 541, 152 P. 125, Am. Dec. 1918-E, 1060, and the principal case cited and quoted from in that case, still being the leading case

in the United States on the question, is Moore v. Nation, 80 Kan. 672, 103 P. 107, 23 L.R.A. (N.S.) 1115, 18 Ann. Cas. 397. Also mentioned is Finley v. Territory, 12 Okla. 621, 73 P. 273-80. These cases were approved by Phelps v. Childers, State Auditor, 184 Okla. 421, 89 P. 2d 782. See, also, 43 Am. Jur. 344, 348, 351, 364.

The reasoning in Moore v. Nation, supra, is persuasive, if not binding, on this court, being the principal case quoted from and relied on by this court, so we must re-examine the source case where the Kansas court refused to accept the reasoning in a great number of leading cases where added duties to an office, for varying reasons, had been declared nongermane. Says Burch, J., at 103 P. 112:

". . . The court is inclined to regard the distinction between duties which 'belong' to an office and duties which may be 'attached' to it as artificial and unsubstantial. The duties of an office include all those that fairly lie within its scope; not merely those which are necessarily involved in the accomplishment of the main purpose of the office, but those also which, although incidental and collateral, naturally and properly serve to promote and benefit the performance of the principal duties. Constitutions and statutes seldom define with precision the scope of any office. The place it usually occupies in political systems of like character is some guide. The common law is relied upon to supply many incidents, and others are left to inclusion by necessary implication. In time the need becomes apparent for further and better definition, and it is said new duties are added, or 'attached', germane to those already in existence. In reality the true scope of the office already included such duties. All that is accomplished is to make active that which before was latent. If the office do not potentially embrace the duty, the duty appertains to another office. Before any duty can be classified as falling within the scope of an office, it must belong there, and nothing can be added or attached to an office that does not belong there. Whatever the standard of classification—**in aid of the usual functions, incidental, collateral, appertaining, or germane to or connected with the principal duties, in line with the main purpose**, or other test,—when tested the duty belongs to the office, is official, and the incumbent must perform it, or it does not belong to the office, is unofficial, cannot lawfully be attached to the office, and need not be performed if an attempt to attach it to the office be made . . .'' (Emphasis ours.)

Justice Burch, in Moore v. Nation, supra, at 103 P. 113, cites Evans v. City of Trenton, 24 N.J.L. 764, holding:

"It is a well-settled rule that a person accepting public office with a fixed salary is bound to perform the duties of the office for the salary. He cannot legally claim additional compensation for the discharge of these duties, even though the salary may be a very inadequate remuneration for the services. Nor does it alter the case **that by subsequent statutes or ordinances his duties are increased** and not his salary. His undertaking is to perform the duties of his office, **whatever they may be, from time to time during his continuance in office** for the compensation stipulated, whether these duties are diminished or increased. Whenever he considers the compensation inadequate, he is at liberty to resign. . . . **This rule is of importance to the public.** The successful effort to obtain office is not unfrequently speedily followed by efforts to increase its emoluments, **while the incessant changes which the progressive spirit of the times is introducing effects, almost every year, changes in the character, and additions to the amount of duty in almost every official station,** and to allow these changes and additions to lay the foundation of claims for extra services would soon introduce intolerable mischief. The rule, too, should be very rigidly enforced. The statutes of the Legislature and the ordinances of our municipal corporations seldom prescribe with much detail and particularity the duties annexed to public offices, **and it requires but little ingenuity to run nice distinctions between what duties may and what may not be considered strictly official**: and, if these distinctions are much favored by courts of justice, it may lead to great abuse.'' (Emphasis ours.)

We think the above language from Moore v. Nation, supra, is unambiguous, is lucid and unmistakable in meaning. But if there is any doubt, then a careful reading of the cases reviewed by Justice Burch and his comments thereon, wherein he refuses to follow the reasoning given by other courts that have permitted office holders to receive extra pay for various new duties added to the office during term, should convince one that this case is authority for a very liberal interpretation of what added duties may be said to be germane to the main duties of an office, and is contrary to some cases decided in other jurisdictions.

This court is committed to the interpretation of the term as set forth in the language of the court in Moore v. Nation, heretofore quoted, and which case was decided in 1909.

That the Oklahoma court (Dudley, C.), in Board of County Commissioners of Creek County v. Bruce, supra (decided in 1915), fully appreciated and understood the expressions of the court in the Moore case, cannot be doubted, if one will carefully read the cases of Barron County v. Beckwith, 142 Wis. 519, 124 N. W. 1030, 30 L.R.A. (NS) 810, 135 Am. St. Rep. 1079, and the City and County of San Francisco v. Mulcrevy et al., 15 Cal. App. 11, 113 P. 339, cases in which court clerks were not permitted to retain, in addition to their salaries, certain fees from the Federal government in naturalization cases, the reasoning in which cases the Oklahoma court approved, but rejected the reasoning in the cases of Eldridge v. Salt Lake County, 37 Utah, 188, 106 P. 939, and Fields v. Multnomah County, 64 Ore. 117, 128 P. 1045, 44 L. R. A. (NS) 322, wherein court clerks were permitted to retain such fees.

We might cite the Kentucky case of James v. Cammack, 139 Ky. 223, 129 S.W. 582, where circuit judges while acting outside their regular districts were allowed additional compensation, although they would necessarily be unable during such absences to perform their duties in their home districts. The reasoning in the Kentucky cases, we think, is contrary to that in Moore v. Nation.

At the other extreme is the case of Grosebeck, Governor, v. Fuller, Auditor General, 216 Mich. 243, 184 N.W. 870, involving an act of the Michigan Legislature creating a State Administrative Board consisting of the Governor, Secretary of State, State Treasurer, Auditor General, Attorney General, State Highway Commissioner, and State Superintendent of Public Instruction. Their duties were to exercise general supervisory control over the functions and activities of all administrative departments, boards, commissions, officers of the state, state institutions, and to perform all duties theretofore vested in the State Budget Commission, the State Purchasing Agent, and also were given control of the system of state accounting.

The effect of the decision of the Supreme Court of Michigan was to hold that the additional salary provided could properly be paid the officers in question, as the added duties were nongermane to the prior duties of the respective state officials, and did not "belong" to such offices. The court pointed out that "the authority of the Legislature to prescribe duties is and must be subject to limitation. The official cannot be required to perform all manner of public service at the will of the Legislature." The duties were entirely of a different nature than the duties of the main office, and this case is readily distinguishable from the Kentucky case.

In Phelps v. Childers, supra, this court held that an official could not be compelled to perform nongermane duties. This rule of law amply protects an office holder from being loaded down with duties that are foreign to his office and that might seriously impair his efficiency in performing the duties of the main office. His first duty is to fulfill the duties of the office to which elected, or appointed, as the case may be.

In Finley v. Territory (1903), supra, it was held that the jurisdiction conferred upon the probate judges in township matters was conferred upon the office, and not the individual, and were official to the office, consideration being given to the fact that territorial probate judges by Act of Congress prior to the term of the judge then in office, were required to act in township matters.

In the Finley case quite a number of decisions are reviewed to illustrate the duties that are part of an office or that are germane thereto. We quote, p. 278:

"The case of State v. Sovereign, 17 Neb. 173, 22 N. W. 353, was a proceeding in mandamus to compel the county clerk to report the fee received by him for making abstracts of title. It appears that the clerk had also been commissioned by the Governor as a notary public. In this case it was contended by the clerk that the abstracts were not made by him as a county clerk, but as a notary public, which office he held by virtue of his appointment from the Governor of the State of Nebraska. And it was contended there, as in this case, that this constituted a separate and distinct office, and that he was not required to account and report for fees received by him as such notary public. The Supreme Court of Nebraska held that the abstract of title was in effect a copy of the entries in the numerical index which the clerk was required to keep as a public record, and that fees received by him for a certified copy of the same must be reported and accounted to the county commissioners, and, where he failed or neglected to report such fees, that mandamus was proper . . . ."

The court in the Finley case reviews the case of United States v. Brindle, 110 U.S. 688, 4 S. Ct. 180, 28 L.Ed. 286, and United States v. Saunders, 120 U.S. 126, 7 S. Ct. 467, 30 L.Ed. 594, two cases cited in many reported cases where the germane theory is involved, and at p. 280 of 73 P. Rep. says:

"In United States v. Saunders, . . . it was decided by the Supreme Court of the United States that the Federal law prohibiting the allowance of additional pay or extra compensation to public officers has no application to two distinct offices, places, or employments, each of which has its own duties and compensation, which offices may both be held by one person at the same time. In this case the rule announced in United States v. Brindle was followed.

"In each of these cases the Supreme Court of the United States held that the offices were entirely separate and distinct, and neither dependent upon the other, and therefore the allowance of additional pay, or extra compensation was admissible. But in the case at bar, as we have shown, the duties that are imposed upon the probate judge attach to that office, and are additional duties and burdens imposed upon such office."

In the case of State ex rel. Trebby v. Vasaly, 98 Minn. 46, 107 N.W. 818-819, the court is quoted by Phelps v. Childers, supra, as stating:

"It is elementary that, while a public official cannot require extra pay for services rendered by him for which compensation by way of salary is allowed by law, he may recover pay for other services which he may render outside of and in addition to his ordinary official duties which could as well be performed by any other person as by him."

It requires a careful reading of the case to get a true insight as to the meaning of the above statement. Trebby was acting as city attorney for Little Falls, Minn. He was not a licensed attorney, but apparently was not required to be, in order to perform his particular duties for the city. Little Falls and members of the council had been sued in the Circuit Court of the United States, and the council passed a resolution appropriating $250 to be paid for services in connection with obtaining certain necessary data to be used as evidence in the Federal court: the length of wire, the amount of pipe laid in the ground, and the like. The trial court from the evidence found that:

"The said services were not rendered by him (the relator) as, and were not contemplated by his election and retainer as, such city attorney, and were not services required to be done by him as such City Attorney, nor were they within the meaning of the statute prescribing and defining the duties of said City Attorney of . . . Little Falls."

And the appellate court held:

"The additional services for which the order was drawn were not only outside his duties as City Attorney, but were not legal services at all, and could have been rendered by any layman sufficiently expert in the questions involved in the United States Circuit Court."

We learn from the facts in the case that Trebby was not an attorney at all and did not gather the statistical information in question by reason of duties of office, or as an attorney for the attorneys handling the case for the city in the Federal court, but performed an extra task having no connection with his office, and therefore was entitled to the compensation provided.

State ex rel. Jennet v. Stevens, 34 Nev. 128, 116 P. 601:

"The position of townsite trustee is not an office within the provisions of the Constitution prohibiting a judge from accepting any office other than a judicial office during the term for which he is elected.

"Since the duties of townsite trustee do not naturally belong to the office of district judge, and it is not incumbent upon the district judge to accept such trust, he may accept compensation for his services as trustee."

On reading the case we find that by virtue of being a District Judge of the Seventh District, respondent Stevens became trustee of the Federal Townsite of Goldfield, Nevada, and in pursuance of law continued to hold such job after the expiration of his office as judge.

Townsite trustee was a position created by an Act of Congress and had no connection with the state law creating the office of district judge, and it was not mandatory for the judge to act as townsite trustee. He was not appointed by the state.

In State ex rel. Howell v. La Grave (Nev.) 48 P. 193, was involved an act consolidating certain state offices. The Secretary of State was made ex-officio clerk of the Supreme Court and ex-officio State Librarian. The court held:

"The two offices being distinct, the annual compensation of $600.00 allowed the Secretary of State as reporter of the Supreme Court's decisions is not a fee or perquisite within Const. Art. 17 §5, providing that no state officer shall receive any fee or perquisite to his own use for the performance of any duty connected with his office."

The Oklahoma case of City of Durant v. Bowles, 110 Okla. 250, 237 P. 572, involved section 4668, C.O.S. 1921, being an act that became effective in 1913 and which abolished the office of police judge in cities of 12,000 or less and provided that such duties should be performed by the mayor, but further provided that the mayor might appoint some other suitable person. Bowles, mayor, acted as mayor and police judge, and sought to collect the fees allowed to police judge in addition to his salary. The court held, citing Moore v. Nation, supra, as supporting the rule:

"Under sec. 4668, C.S. 1921, the duties of police judge in cities designated therein, are imposed upon the mayor without the right to retain the costs, taxed and collected for police judge, as additional compensation to that fixed by ordinance for him as mayor."

The plaintiffs claim that the duties added to the office of Corporation Commissioner by House Bill 172 are not different from the duties provided or added to the duties of certain Justices by art. 1, chap. 21, page 33, Oklahoma Session Laws 1937, construed in Phelps v. Childers, supra. **Said act became obsolete in 1941.** The Attorney General points out some important distinctions

which we think effectively answers this contention, which we shall renumber 1 to 4:

"1. The compiling and annotating duties prescribed by the 1937 act are **executive or administrative** in nature and hence could not be imposed by law as a germane duty on judicial officers such as said three members of our Supreme Court, **while** the compiling and annotating duties prescribed by House Bill 172 could be imposed by law **as a germane duty** on members of the Corporation Commission, since said body has **executive and administrative** as well as legislative powers (See Syllabus 1 of Muskogee Gas & Electric Co. v. State, 81 Okla. 178, 186 P. 730.)"

Further attention is called to the fact that members of the Supreme Court, prior to said act, had never had any such duties assigned.

"2. The compensation of said three members of our Supreme Court for performing the compiling and annotating duties prescribed by the 1937 act was payable out of unallocated moneys in the general revenue fund of the state, **while** the compensation of the three members of the Corporation Commission for performing the compiling and annotating duties prescribed by House Bill 172 are payable (until a legislative act is passed 'providing for an equivalent increase in pay' for members of the Corporation Commission out of the general revenue funds of the state') from the 'Conservation Fund' created by an excise tax on petroleum levies under authority of chapter 26, Title 68, page 273 Oklahoma Session Laws 1945, 68 O.S. Supp. 1945 §§1219.7 to 1219.12 'for the payment' of defined expenses of the oil and gas conservation department of the Corporation Commission in performing certain proper and germane duties thereof."

"3. **Under the 1937 act** the compiling and annotating duties of the three members of our Supreme Court and the payment of an annual salary of $2,500.00 to each as compensation therefor **terminated** under the provisions of said act on the second Monday of January, 1941, **without reference** to a possible future law providing for an equivalent increase in the regular salary of said compilers and annotators as members of the Supreme Court for performing such services, **while under House Bill 172** the compiling and annotating duties of the three members of the Corporation Commission **are continuous** and the $2,500.00 annual salary of each therefor, payable out of said Conservation Fund, **will continue,** "until such time as said compilation and annotation has been completed (no completion date is set forth in the act) **or until such time as an act of the Legislature of this state providing for an equivalent increase in pay out of the general revenue funds shall be effective as to each member of the Corporation Commission,** whichever time is shorter, 'which indicates that the Legislature considered said duties as being 'incident to or germane to' the regular duties of said members, for the performance of which regular duties, as so increased, the Legislature could (and would) provide increased salaries payable from the general revenue fund of the state."

"4. The compiling and annotating duties imposed on the three members of the Corporation Commission by House Bill 172, **unlike** those imposed by the 1937 act on the three members of our Supreme Court who were elected in November, 1934, for terms of office ending on the second Monday of January, 1941, are not limited to the terms of the commissioners who were in office at the time House Bill 172 was enacted. . . ."

We conclude that nongermane services are usually small ministerial tasks added to the duties of an officer and to be performed usually for a limited time, and are duties having no connection whatever with the main tasks of the office, and that he is not bound to perform them. If the duties are also of an administrative nature and foreign to the main office, a separate office may be created which the official may hold and draw the additional compensation provided, should there be no statute in effect preventing him from holding two offices at the same time.

We believe it will be admitted that the new duties added to the office of Corporation Commissioner by House

Bill 172, supra, would be germane to the duties of any successor to any of the three present Corporation Commissioners, and likewise to their duties if elected hereafter. See City of Durant v. Bowles, supra. We conclude, then, that the Legislature considered the duties germane to the office, and the commissioners are permitted to prepare **"in such manner as they deem proper"** said annotations. This no doubt means that the commissioners will accomplish the added tasks through clerks and will merely supervise, as is the case in connection with a multitude of other duties of the office.

As was said in State ex rel. State Board of Medical Examiners v. Clausen, 84 Wash. 279, 146 P. 630, and approved in State ex rel. Sim et al. v. Superior Court for Chelan County et al., 13 P. 2d 892:

"It is a well recognized rule of law that, if a board is charged with a specific duty and the means by which the duty is to be accomplished are not specified or provided for, the board so charged has the implied power to use such means as are reasonably necessary to the successful performance of the required duty."

Without doubt the duties and powers of the Corporation Commission in Oklahoma cover more subjects and are broader and more complex than any other state office. If we have a fair understanding of the term "germane," as defined by the dictionaries and by the courts, and particularly by Burch, J., in Moore v. Nation, supra, and have read Article 9 of the Constitution, and have considered the official duties of the commissioners in the field of oil and gas conservation, how can we say that the new duties are not in aid of those functions, are not incidental, not collateral, do not appertain, are not connected with the principal duties, are not in line with the main purpose, or promote the main purpose,—in short, are not germane? Unless we can say these things, then we are bound to say that the new duties are official and germane.

If the commissioners were given the duty of assisting the State Librarian, painting a building, teaching in the new law school, or performing duties disconnected with their office and foreign thereto, we would have a different situation.

The fact that the Legislature has required the commissioners to file certificates in the office of Secretary of State, setting forth their willingness to perform said services, can make no difference, where the duties are germane.

We cannot question the motives of the Legislature and say that it is evident from said clause that it was trying to evade the constitutional provisions by attempting to assign what were thought to be nongermane duties; we can only say that said clause is surplusage.

As indicated in Moore v. Nation, supra, there are functions of public office that are latent; yesterday there was not the remotest suggestion of the picture presented by this day. That picture is the result of a way of life, of scientific revelations, of growth and change,—in short of the activity of a people, or a lack thereof, as the case may be. The Legislature senses the trend and at the proper time breathes life into that which yesterday was unrevealed. To hold otherwise would be to accuse the Legislature of trifling with fundamental principles of government.

For the reasons indicated, we conclude that the compiling and annotating duties imposed by said act on the three members of the Corporation Commission are incident to or germane to the duties of the Corporation Commission, and that while said sections are valid, the provisions thereof providing compensation for performing said duties are not, by virtue of section 10, art. 23 of the State Constitution, applicable to the members of the Corporation Commission who were in office when House Bill No. 173 was enacted.

RILEY, Acting C.J., concurs in the views herein expressed.